18

El Pueblo de Puerto Rico, demandante y apelado, *v.* Antonio Roig, Sucrs., S. en C., demandada y apelante.

Núm. 8803.—*Sometido:* Noviembre 2, 1943.  *Resuelto:* Febrero 1, 1944.

*James R. Beverley, R. Castro Fernández* y *José López Baralt,* abogados de la apelante; *Hon. Procurador General Interino M. Rodríguez Ramos, A. E. Franco Cabrero, Subprocurador Auxiliar,* y *Pablo Defendini,* abogado éste de la Comisión de Servicio Público, abogados todos del apelado.

El Juez Asociado Señor Todd, Jr., emitió la opinión del tribunal.

La cuestión a decidir en este recurso es si la Ley núm. 221 aprobada en mayo 12 de 1942, mediante la cual nuestra Legislatura declaró empresas de servicio público a todas las

compañías azucareras de Puerto Rico [1], viola el artículo 2 de nuestra Ley Orgánica sobre debido procedimiento de ley, al exigirle a la Sociedad demandada, que alega no está sirviendo ni desea servirle al público en general, que obtenga una franquicia de la Comisión de Servicio Público y que al hacerlo se someta a las disposiciones de dicha ley. Los hechos, sucintamente expuestos, son los siguientes:

Antonio Roig, Sucrs., S. en C., es dueña de dos ingenios de azúcar en el distrito de Humacao—la "Central Roig" y la "Central El Ejemplo". En la "Central Roig", además de cañas de azúcar de su propiedad, la apelante muele cañas de distintos colonos, y en cuanto a esta Central se acogió a los términos de la Ley núm. 221, habiendo solicitado y obtenido la franquicia que dicha ley requiere [2]. En cuanto a

[1] "Artículo 12.—La manufactura, elaboración y refinación de azúcar se declaran empresas de servicio público y ninguna persona natural o jurídica se dedicará en Puerto Rico a tales empresas sin haber obtenido una franquicia con arreglo a las disposiciones de esta Ley. Se declaran compañías de servicio público las compañías azucareras conforme se definen en el artículo 2 del Capítulo I de esta Ley, y asimismo se declara compañía de servicio público toda persona natural o jurídica que en Puerto Rico se dedique, como dueña, arrendatario o en cualquier otro concepto a la manufactura, elaboración, o refinación de azúcar."

El artículo 2 de la ley dice así:

"Artículo 2.—La expresión 'compañía azucarera', según se usa en esta Ley, significa cualquier persona natural o jurídica que en Puerto Rico, con arreglo a las disposiciones de esta Ley, se dedique, como dueña, arrendataria, explotadora, administradora, poseedora, o en cualquier otro concepto, a la manufactura, elaboración o refinación de azúcar. La expresión 'compañía azucarera' incluye también cualquier persona natural o jurídica que en cualquier forma adquiera cañas de azúcar para su conversión en azúcar crudo o refinado, o azúcar crudo para su refinación, así como cualquier persona natural o jurídica que en cualquier forma actúe como intermediario, agente de negocios o corredor entre una compañía azucarera y sus colonos. Las 'compañías azucareras' no estarán sujetas a las disposiciones de esta Ley en lo que respecta a cualquier negocio que hicieren o a cualquier propiedad perteneciente a ellas fuera de Puerto Rico; ni se interpretarán las disposiciones de esta Ley en el sentido de aplicarse a cualquier asunto o cosa con respecto al cual el Congreso ha dictaminado con exclusión del poder de Puerto Rico."

[2] "Artículo 18.—Treinta días después de empezar a regir esta Ley, toda compañía azucarera conforme se define en el artículo 2 del Capítulo I de esta Ley y toda persona dedicada en Puerto Rico a la manufactura, elaboración o refinación de azúcar, quedarán bajo la jurisdicción y sujetas a la autoridad de

la "Central El Ejemplo", la apelante se negó a solicitar franquicia alegando que debido al hecho de que no muele, ni tiene intenciones ni deseos de moler cañas de azúcar que no sean las propias, la Legislatura carece de poder para exigirle la obtención de dicha franquicia e imponerle las reglamentaciones que dispone la Ley núm. 221; que su negocio es uno de carácter privado, en el cual el público no puede tener interés y que por lo tanto no puede ser convertido en empresa de servicio público por mero fíat legislativo.

El Procurador General de Puerto Rico, actuando de

la Comisión y ninguna persona natural o jurídica podrá dedicarse a la manufactura, elaboración o refinación de azúcar a menos que solicite y obtenga de la Comisión una franquicia que la autorice para ello. Toda franquicia, privilegio o concesión para dedicarse en Puerto Rico a la manufactura, elaboración o refinación de azúcar será otorgada por la Comisión con arreglo a las reglas y reglamentos que la Comisión establezca de acuerdo con las disposiciones de la Ley Orgánica y de esta Ley."

"Artículo 66.—Tres (3) meses después de la fecha en que empiece a regir esta Ley ninguna persona natural o jurídica podrá dedicarse en Puerto Rico a la manufactura, elaboración o refinación de azúcar a menos que haya obtenido una franquicia que con carácter provisional le será expedida por la Comisión a la cual, por la presente, se autoriza y ordena para que expida tal franquicia con carácter provisional a toda persona natural o jurídica dedicada a la manufactura, producción, elaboración o refinación de azúcar que la solicite dentro de los treinta (30) días siguientes a la fecha en que empiece a regir esta Ley. Tal franquicia con carácter provisional se ajustará a las disposiciones de esta Ley y a las reglas y reglamentos que dictare la Comisión, excepto que no tendrán que contener necesariamente limitaciones en cuanto a la zona de producción de la parte solicitante. Tal franquicia provisional será válida solamente por un año.

"Dentro del año siguiente a la concesión de tal franquicia provisional la Comisión podrá sustituirla, a petición de la concesionaria que deberá radicarse en la Comisión dentro de los primeros tres meses de dicho año, por una franquicia final en la cual se incluirán necesariamente las disposiciones que en cuanto a la zona de producción de la parte solicitante hubiere determinado la Comisión y todas las demás disposiciones que la Comisión considere conveniente incluir en tal franquicia final con arreglo a esta Ley y a la Carta Orgánica. Quince meses después de la fecha en que esta Ley empiece a regir, ninguna persona natural o jurídica podrá dedicarse en Puerto Rico a la manufactura, elaboración o refinación de azúcar a menos que haya solicitado y obtenido de la Comisión la concesión de tal franquicia final. Toda persona natural o jurídica o toda compañía azucarera y todo funcionario, empleado o agente de las mismas que violare cualquiera de las disposiciones de este artículo, incurrirá en delito menos grave (*misdemeanor*) y convicto que fuere, sufrirá pena de cárcel por término mínimo de un mes y máximo de un año, o multa mínima de dos mil (2,000) dólares, o ambas penas a discreción del tribunal."

acuerdo con el artículo 55 de la Ley núm. 221[3], radicó en la corte inferior una petición de *injunction* a nombre de El Pueblo de Puerto Rico en la cual solicitó se prohibiera a Antonio Roig, Sucrs., S. en C., moler sus cañas de azúcar a menos que obtuviera, como requisito previo, dicha franquicia, sometiéndose así a la jurisdicción de la Comisión. La corte inferior concedió el injunction y es contra esa sentencia que se ha entablado el presente recurso.

La apelante señala cuatro errores y luego condensa los tres primeros en uno solo que dice así:

"La Ley núm. 221 de mayo 12, 1942 es inconstitucional y nula en cuanto trata de convertir un negocio privado en empresa de servicio público, bajo el viso del poder para reglamentar dentro del *police power*."

Antes de entrar a considerar el problema legal en su fondo conviene hacer constar que la apelante admite que no ataca "la facultad de la Legislatura de Puerto Rico, dentro del *police power,* para reglamentar un negocio privado investido con interés público, como lo es y siempre lo ha sido la industria azucarera de Puerto Rico." Arguye, además, que el error de la corte inferior consiste "en haber confundido la facultad de la Legislatura para reglamentar, dentro del *'police power'* un negocio investido con interés público —facultad que indudablemente tiene—con la facultad para obligar a dedicar propiedad privada al uso del público, sin el consentimiento del dueño—facultad que no tiene, de acuerdo con todas las decisiones del Tribunal Supremo Nacional. La corte inferior se impresionó tanto con el gran interés público con que está investida la industria azucarera en Puerto Rico que olvidó por completo considerar el segundo factor indis-

---

[3] "Artículo 55.—El Procurador General, además de ejercer las facultades y deberes que le están conferidos por la ley, deberá también, a petición de la Comisión o de oficio, proceder a nombre de El Pueblo de Puerto Rico, mediante *mandamus, injunction* o *quo warranto* u otro recurso adecuado en derecho y equidad a impedir infracciones de las disposiciones de esta Ley, o de las órdenes de la Comisión, o de la sentencia, órdenes o decretos de dicha corte, o para obligar al cumplimiento de las mismas."

pensable para poder exigir una franquicia, a saber: que el dueño del negocio *esté dedicando su propiedad a* SERVIR AL PÚBLICO O ESTÉ EN REALIDAD SIRVIENDO AL PÚBLICO.''. Por tanto, la contención de la apelante es "que la Legislatura de Puerto Rico carece de facultad para convertir un negocio privado en una empresa de servicio público, mientras su dueño se abstenga de servir al público o de dedicarlo al servicio público, aunque (dicho negocio) esté investido de interés público." De manera que la apelante acepta, por lo menos implícitamente, que todas aquellas centrales de Puerto Rico que, como su propia "Central Roig", muelen cañas de colonos pueden ser válidamente declaradas compañías de servicio público, pero no así aquellas centrales que, como la "Central El Ejemplo", no muelen cañas de otros colonos. Asimismo, y esto es de gran importancia a la resolución de este caso, la apelante reconoce, expresamente, la facultad de la Legislatura para reglamentar precios, contratación, horas y salarios de una manera justa y razonable dentro de su poder de policía, aun en el caso de la "Central El Ejemplo". En resumen, pues, lo único que la apelante impugna, según el hecho 5 de su contestación, es el poder de la Legislatura para exigirle una franquicia "para moler sus propias cañas de azúcar en su propio ingenio azucarero".

Tenemos, por lo tanto, que no existe controversia alguna en cuanto al hecho de que la industria azucarera en Puerto Rico está revestida de un gran interés público.

Gran parte de la exposición de motivos de la Ley núm. 221, no hace otra cosa que transcribir párrafos de opiniones de las cortes insulares y federales en las cuales se toma conocimiento judicial de la importancia de la industria azucarera en relación con la economía de la Isla. Para no extender innecesariamente esta opinión nos limitamos a exponer al margen el origen de dichos párrafos.[4]

---

(4) Opinión de esta Corte Suprema en *Pueblo v. Rubert Hnos., Inc.,* 53 D.P.R. 779; opinión de la Corte de Distrito de San Juan en *Plata Sugar Co. v. Fernández García;* opinión Corte Circuito de Apelaciones en *Vidal* v. *García,* 104 F. (2d) 606.

Empero, la declaración por la Legislatura de que un negocio está investido de interés público,. ratificada por las cortes, y la aceptación de ese hecho por las partes en relación con un caso específico, no es concluyente en cuanto a si la reglamentación que dispone la ley está justificada o no. No sólo la reglamentación sino que aun las circunstancias que se puedan alegar existen para declarar que un negocio privado está afectado de interés público, cuando este hecho no se acepta, están siempre sujetas a inspección judicial, no para imponer nuestro criterio sobre el problema, sino para determinar sobre la razonabilidad de la determinación legislativa sobre el mismo.

Como en el caso de autos la controversia ha quedado circunscrita a determinar la razonabilidad, justificación o poder de la Legislatura para declarar el negocio de la apelante empresa de servicio público sujeto a la adquisición de una franquicia, consideramos apropiado hacer un resumen del origen y desarrollo de la debatida frase "afectado de interés público" usada en relación con un negocio privado. En primer término diremos que la jurisprudencia del Tribunal Supremo Nacional sobre la materia ha sido objeto de diversos ensayos y comentarios que demuestran la importancia que a la doctrina se le ha concedido. Al margen citamos algunos de dichos trabajos para un estudio más amplio de la cuestión.[5] Basta consignar que fué en el famoso caso *Munn* v. *Illinois,* 94 U. S. 113 (1873) que por primera vez se injertó en el derecho constitucional americano dicha frase para hacerla formar parte del poder de policía del estado. En dicho caso el Juez Waite aplicó el casi olvidado dicho de Lord Hale,

---

(5) Hamilton, Affectation with Public Interest, 39 Yale L. Journal 1089 (1930); McAllister, Lord Hale and Business Affected with a Public Interest, 43 Harvard L. Rev. 759 (1929); Harbeson, The Public Interest Concept in Law and Economics, 37 Mich. L. Rev. 181; Robinson, The Public Utility: A Problem in Social Engineering (1928) 14 Cornell L. Q. 1; Keezer, The "Public Interest" Doctrine (1927), 25 Mich. L. Rev. 596; Robinson, The Public Utility Concept in American Law (1928), 41 Harv. L. Rev. 277; Powell, State Utilities and The

24

consignado en su tratado *De Portibus Maris,* al efecto de que los dueños de un muelle o embarcadero al cual necesariamente tienen que acudir todas las personas a descargar o cargar sus mercancías no pueden establecer derechos o tributos arbitrarios y excesivos debido a que esa necesidad por parte del público ha investido el embarcadero de interés público y ha dejado de ser solamente *juris privati.*

La corte, aplicando esta norma, resolvió que los elevadores de grano del estado de Illinois estaban afectados de interés público y que por lo tanto la Legislatura podía, sin violar la Enmienda Catorce de la Constitución, fijar los tributos máximos que los dueños de dichos elevadores podían cobrar por almacenar los granos. Al exponer la doctrina dijo la corte, a la página 126:

"La propiedad sí queda afectada con un interés público cuando se usa en una forma que la hace de importancia pública y afecta a la comunidad en general. Por tanto, cuando uno dedica su propiedad a un uso en el cual el público tiene un interés, en efecto le concede al público un interés en dicho uso, y tiene que someterse a ser controlado por el público para el bien común, en la extensión del interés que así ha creado. Él puede retirar su concesión descontinuando el uso, pero, mientras mantenga el uso, tendrá que someterse al control."

Empero, a través de los años y en una serie de casos que citamos al margen [6] la frase fué aplicada o no a distintos

---

Supreme Court (1931), 29 Mich. L. Rev. 811, 1001; Goddard, The Evolution and Devolution of Public Utility Law (1934), 32 Mich. L. Rev. 577; Hale, The Constitution and the Price System; Some Reflection on Nebbia v. New York (1934), 34 Columbia L. Rev. 401; Finkelstein, From Munn v. Illinois to Tyson v. Banton; A study in the Judicial Process (1927), 27 Columbia L. Rev. 769; Goldsmith and Winks, Price Fixing: From Nebbia to Guffey, Selected Essays on Constitutional Law, vol. 2, pág. 531.

([6]) *Brass* v. *Stoeser,* 153 U.S. 391; *German Alliance Co.* v. *Lewis* 233 U.S. 389; *Block* v. *Hirsh,* 256 U.S. 135; *Marcus Brown Holding Co.* v. *Feldman,* 256 U.S. 170; *Wolff Packing Co.* v. *Industrial Court,* 262 U.S. 522; *Tyson* v. *Banton,* 273 U.S. 418; *Ribnick* v. *McBride,* 277 U.S. 350; *Williams* v. *Standard Oil Co.,* 278 U.S. 235; *New State Ice Co.* v. *Liebmann,* 285 U.S. 262; *Nebbia* v. *New York,* 291 U.S. 502; *Townsend* v. *Yeomans,* 301 U.S. 441; *Olsen* v. *Nebraska,* 313 U.S. 236.

negocios, convirtiéndose , como se dijo en el caso de *Williams v. Standard Oil Co., infra,* en "la fórmula de prueba establecida para determinar el alcance del poder legislativo para fijar los precios de mercancías, uso de propiedad o de servicios." Esto no obstante, los jueces Holmes, Brandeis y Stone en distintas opiniones disidentes en algunos de los casos citados, están contestes en que la frase no tiene el alcance limitado que la mayoría de la Corte Suprema Nacional le dió según las circunstancias de cada caso y según su criterio restringido. Así en el caso de *Tyson,* supra, el Juez Holmes, con su característica habitual de ir a la raíz de los hechos y de los problemas que competían a la legislatura resolver y no a los tribunales se expresó en la siguiente forma:

"La moción de que un negocio está investido con un interés público y ha sido dedicado a un servicio público es poco más que una ficción usada con el fin de establecer lo que es desagradable para los perjudicados. *La verdad me parece ser que, sujeto a compensación cuando ésta deba pagarse, la legislatura puede prohibir o restringir cualquier negocio cuando tiene suficiente fuerza de opinión pública que la respalde."* (Bastardillas nuestras.)

Con tanta o mayor claridad el Juez Brandeis en su opinión disidente en el caso de *New States Ice Co.,* supra, con la cual concurrió el Juez Stone, expresó, a nuestro juicio, el verdadero alcance de la doctrina. En dicho caso el Estado de Oklahoma aprobó una ley declarando la manufactura, venta y distribución de hielo un negocio público y que a nadie se le permitiría dedicarse a dicho negocio sin obtener una licencia de la "Corporation Commission". La mayoría del tribunal resolvió que la ley era inconstitucional por considerar que el negocio era uno de carácter privado y no estaba afectado de un interés público, que si bien el negocio podía ser razonablemente reglamentado el mismo no era "una industria primordial de la cual dependiera la prosperidad de todo el estado."

El elaborado y erudito disenso del Juez Brandeis es demasiado extenso para ser citado en su totalidad. Nos limi-

.tamos a transcribir sus párrafos más importantes. En cuanto al poder de la Legislatura para convertir un negocio privado en uno de servicio público, dijo:

"Oklahoma declaró el negocio de manufactura de hielo para la venta y distribución un 'negocio público'; es· decir, una empresa de servicio público. De lo que aparece fué el primer Estado en hacerlo. Desde luego, la Legislatura no puede por un mero *fiat* legislativo convertir un negocio en una empresa de servicio público. *Producers Transportation Co.* v. *Railroad Commission*, 251 U. S. 228, 230. Pero el concepto ·de una empresa de servicio público no es· estático. El bienestar de la comunidad puede requerir que el negocio de suplir hielo sea convertido en una empresa de servicio público, tanto como el negocio de suplir agua o cualquier otro artículo de comercio o servicios necesarios. Si el negocio es, o puede ser convertido, en una empresa de servicio público, tiene que ser .posible el que se exija la expedición de un certificado como un requisito previo para poder dedicarse a él.

*"Si las condiciones locales son tales que justifiquen el convertir un negocio privado en uno público es una cuestión primordial para ser determinada por la legislatura del estado.* Su determinación está sujeta a revisión judicial; pero la presunción usual de su validez cubre su aprobación. La acción del Estado tiene que sostenerse como válida a menos que sea claramente arbitraria, caprichosa o irrazonable (citas). Si las quejas son reales o imaginarias, si los remedios son sabios o tontos; no son cuestiones sobre las cuales la corte pueda preocuparse (citas). No debe hacerse una decisión de que la creencia de la legislatura de los males era arbitraria, caprichosa o irrazonable, sin investigar los hechos en relación con los cuales actuó.''

Después de analizar los hechos y las condiciones existentes en Oklahoma en relación con la industria del hielo, pasa el Juez Brandeis a considerar la alegación de que dicho negocio es uno de carácter inherentemente privado y que por tanto el Estado no puede prohibir el derecho de .ejercitarlo libremente y contesta el argumento diciendo que también los negocios de suplir para la venta agua, electricidad y gas son inherentemente de carácter privado pero que el vender y suplir cualquier clase de artículos o servicio pueden llegar a ser

de transcendencia pública y dice: "Si lo es o no, *depende de las condiciones existentes en la comunidad.* Si es una materia de interés público, puede ser regulada, no importa cuál sea el negocio. El interés público puede estar limitado a una faz del negocio de manera que la protección requerida pueda asegurarse con una reglamentación relativamente pequeña. Tal es el interés sobre la posible incompetencia que requieren las licencias a dentistas (citas), o el criterio sobre la posible falta de honradez que llevó a las licencias de almonederos (citas). *Empero, el interés público en un negocio determinado puede ser tan profundo (pervasive) y variado que requiera una supervisión detallada constante y un grado muy alto de reglamentación. Cuando esto es cierto, es corriente hablar del negocio como uno 'público' aunque de dueño privado.* Es a tales negocios que comúnmente se les designa como de utilidad pública (*public utility*) o se habla de ellos como 'afectados de un interés público'. *German Alliance Co.* v. *Lewis,* 233 U. S. 389, 408. (Pág. 301, bastardillas nuestras.) Y entrando de lleno a considerar el significado de esta frase, dice:

"Una reglamentación válida para una clase de negocio puede, desde luego, ser inválida para otro; pues la razonabilidad de toda reglamentación *depende de los hechos relevantes. Pero en tanto concierne al poder de reglamentar, no hay diferencia esencial entre un negocio llamado privado y uno llamado de utilidad pública o que se dice 'afectado de interés público'. Cualquiera que sea la naturaleza del negocio, cualquiera que sea el alcance o carácter de la reglamentación que se aplique, la fuente del poder invocado es el mismo, y asimismo la limitación constitucional sobre dicho poder. La fuente es el poder de policía. La limitación es aquella impuesta por la cláusula sobre debido procedimiento, la cual, según interpretada, requiere que la reglamentación no sea irrazonable, arbitraria y caprichosa, y que los medios de reglamentación seleccionados tengan una relación real y substancial al objeto que se desea obtener. La noción de una categoría separada de negocio 'afectado de interés público' que emplea propiedad 'dedicada a un uso público' descansa en un error histórico.* Las consecuencias que se desea extraer de esas

frases están negadas por el significado con que primero fueron usadas hace siglos [7] y por la decisión de esta Corte en Munn v. Illinois, 94 U. S. 113, que por primera vez las introdujo en nuestro derecho constitucional. *En mi opinión, el verdadero principio es que el poder del Estado se extiende a toda reglamentación de cualquier negocio razonablemente requerida y apropiada para la · protección del público. No encuentro en la cláusula sobre debido procedimiento ninguna otra limitación al carácter o alcance de la reglamentación permisible.''* (Bastardillas nuestras.)

Continúa entonces el Juez Brandeis citando ejemplos de negocios que a pesar de haber sido originalmente de carácter privado han sido de tiempo en tiempo reglamentados, prohibidos o · convertidos en monopolios o de servicio público. Analiza las situaciones económicas y la depresión que existían debido a la emergencia creada por la guerra anterior y la forma en que los economistas investigaban sus causas y examinaban de nuevo las bases de la estructura económica de la nación en busca de posibles remedios, y expone que todos estaban de acuerdo en que se debía a ''la irregularidad en el empleo—el mayor de nuestros males—a menos que la producción y consumo estén mejor balanceados muchos insisten en que debe haber un control económico.'' Expone en detalle y con numerosas citas de autoridades económicas las distintas soluciones sugeridas y admite los peligros que ellas pueden acarrear, pero llama la atención hacia el hecho de que el éxito obtenido en el campo de las ciencias exactas y de los inventos se debe al proceso de experimentación, y dice:

''Algunas personas afirman que nuestra situación presente se debe, en parte, a las limitaciones que las cortes han puesto a la experimentación en los campos de las ciencias sociales y económicas y al desaliento a que han sido sometidas otras proposiciones para su mejoramiento. *Tiene que haber poder en el Estado y en la nación para moldear de nuevo por experimentación, nuestras prácticas e instituciones económicas para dar frente a las variantes necesidades*

---

(7) Aquí Brandeis cita el Tratado sobre los Puertos, de Lord Hale y el ensayo de McAllister, supra, y sostiene que el primero no podía estar refiriéndose a limitaciones del poder legislativo del Parlamento pues en Inglaterra el Parlamento acostumbraba reglamentar los precios de mercancías de todas clases.

*sociales y económicas.* No puedo creer que los autores de la Enmienda Catorce o los Estados que la ratificaron, tuvieron la intención de privarnos del poder de corregir los males del desempleo tecnológico y de capacidad productiva excesiva que han *seguido el progreso de las artes útiles.*

"*Detener la experimentación en cuestiones sociales y económicas es una grave responsabilidad. Denegar el derecho de experimentar puede traer graves consecuencias a la nación. . . . Esta Corte tiene el poder de prohibir un experimento. Podemos demoler el estatuto que lo encarna por el fundamento de que, en nuestra opinión, la medida es arbitraria, caprichosa e irrazonable.* Tenemos el poder de hacer esto porque la cláusula sobre debido procedimiento ha sido interpretada por esta Corte como aplicable tanto a cuestiones de ley sustantiva como a cuestiones de procedimiento. *Pero en el ejercicio de este alto poder, debemos siempre estar en guardia, no sea que convirtamos nuestros prejuicios en principios legales. Si deseamos guiar por la luz de la razón debemos permitir que nuestras mentes sean valientes.*" (Pág. 311, bastardillas nuestras.)

Después de esta brillante opinión disidente del Juez Brandeis, con la precedente del Juez Holmes en el caso de *Tyson,* sólo necesitó la frase "afectado de interés público" un cambio en los componentes del Tribunal Supremo Nacional para prevalecer en su verdadero alcance. Así vemos que en el caso de *Nebbia* v. *N. Y.,* supra, al sostenerse la validez del estatuto fijando un precio mínimo a la leche, la corte aceptó que, como regla general, el uso de propiedad y el derecho a contratar normalmente están exentos de intervención gubernamental; pero sostuvo que ni los derechos de propiedad, ni los que surgen de contratos son derechos absolutos, ya que el gobierno no podría subsistir si el ciudadano estuviera en libertad de usar su propiedad en detrimento de sus semejantes; que desde tiempo inmemorial se ha reconocido el poder para fomentar el bienestar general como un poder inherente de los gobiernos, el cual, sujeto a restricciones constitucionales, es superior a los derechos privados; que la garantía del "debido procedimiento de ley"—y esto es lo fundamental—sólo requiere que la ley no sea irrazonable, arbi-

traria y caprichosa, y que el método seleccionado para llevar a cabo su propósito tenga una relación real y sustancial al fin que se persigue; que siendo ésta la norma a seguirse resulta que reglamentaciones válidas para algunos fines y negocios pueden ser inválidas para otros, ya que la razonabilidad de cada reglamentación depende de los hechos relevantes al caso.

La Corte procede entonces a contestar el argumento de que el control público de tarifas o precios es irrazonable e inconstitucional *per se* excepto en cuanto a negocios afectados de interés público, y que la industria de la leche no es uno de esos negocios. Acepta que dicha industria no es una compañía de servicio público (*public utility*) en el sentido corriente que se le da a esa frase; que no existen condiciones de monopolio en dicha industria, y que aquellos que a ella se dedican no ostentan franquicias otorgadas por el Estado y luego dice:

"La idea parece sin embargo que ha prevalecido de que hay algo peculiarmente sacrosanto en cuanto al precio que uno puede cobrar por lo que hace o vende; y que, no importa cuánto se pueda reglamentar otros alimentos de la manufactura o comercio con efecto incidental sobre el precio, el Estado no puede controlar directamente el precio mínimo. Esta opinión fué negada hace muchos años. *Munn* v. *Illinois*, 94 U. S. 113."

Aquí tenemos, pues, cristalizadas en la opinión de la mayoría de la corte, las doctrinas que anteriormente habían expresado Holmes, Brandeis y Stone. "Así entendido", dice la corte, y ésta es la médula de la opinión, "afectado con un interés público, es equivalente a sujeto al ejercicio del poder de policía; y es claro que *nada más* se intentó con la expresión." (Pág. 533.) "Decir que uno ha dedicado su propiedad a un uso público, es, por tanto, meramente otra forma de decir que si uno se dedica a un negocio que el interés público requiere ser reglamentado debe saber que la reglamentación vendrá." (Pág. 533.) "Es claro que no existe ninguna clase o categoría cerrada de negocios afectada con un interés pú-

blico, y la función de las cortes al aplicar las Enmiendas Quinta y Catorce es determinar en cada caso si las circunstancias justifican la reglamentación atacada como un razonable ejercicio de la autoridad gubernamental o condenarla como arbitraria o discriminatoria." (Pág. 536.) (Bastardillas nuestras.)

Refiriéndose entonces a los casos de Wolff, Tyson, Ribnik y Williams, supra, la corte hace la siguiente declaración:

"Esas decisiones deben descansar, finalmente, sobre la base de que los requisitos del debido procedimiento no fueron cumplidos porque las leyes eran arbitrarias en su operación y efecto. Pero no puede haber duda de que en ocasión propicia y por medidas apropiadas el Estado puede reglamentar un negocio en cualquiera de sus aspectos incluyendo los precios que han de cobrarse por los productos o mercancías que venda." (pág. 537.)

La corte, en el caso de Nebbia, supra, no revoca expresamente los casos de Tyson, Ribnik y Williams, en los cuales se sostuvo que los negocios de revendedores de teatros, agentes de empleos y de venta de gasolina no estaban afectados de interés público, pero es igualmente obvio que rechaza el criterio allí usado como base para dichas decisiones. Es de notarse también que la corte no menciona la decisión en *New State Ice Co.* v. *Liebmann,* supra, pero como sugiere el comentarista Swellings en 8 Tulane Law Rev. 442, 448, si se toma en consideración que la doctrina enunciada se basa principalmente en las ideas expresadas por Brandeis en su disenso en dicho caso, es razonable concluir que el caso de Liebmann ha sido revocado *sub silentio.*

Además, en el caso de *Olsen* v. *Nebraska,* 313 U. S. 236, que revoca específicamente el de *Ribnik* y se sostiene la validez de un estatuto de Nebraska fijando la tarifa máxima que una agencia de empleos puede exigir por sus servicios, se hace constar que la doctrina del caso de *Ribnik* siguió las ideas expresadas en el de *Tyson,* y que el caso de *Williams,* a su vez, siguió lo dicho en el de *Ribnik,* diciendo entonces la corte: "El caso de Ribnik, libre de la norma allí usada,

no puede subsistir'' (pág. 246). Somos de opinión, por tanto, que los casos de Tyson y Williams también han sido revocados *sub silentio*.

De acuerdo con esta última jurisprudencia en los casos de Nebbia y Olsen, siguiendo la pauta del disenso del Juez Brandeis, creemos justificado sostener que no hay una categoría cerrada de negocios afectados de interés público; lo que existe es un campo global en el cual la Legislatura puede intervenir mediante reglamentaciones razonables para proteger el interés público, intervención que ya no sólo cubre el campo de las compañías de servicio público propiamente dichas, sino también el campo de los negocios en general. A este efecto se ha sugerido que el *"public interest test"* ha sido desplazado por el de *"reasonable exertion of governmental authority"*, *Kent Stores of New Jersey* v. *Wilentz*, 14 F. Supp. 1, 10. Es fundamental, sin embargo, que lo que pudiera considerarse como una reglamentación razonable en cuanto a una industria podría resultar irrazonable en cuanto a otra. Cada situación debe resolverse por sus propios méritos.

La corte inferior, al sostener la Ley núm. 221, tomó en consideración las leyes de Oklahoma relativas a la industria del algodón y las decisiones que interpretan dichas leyes. Pasamos ahora a considerarlas. El Artículo 4, Capítulo 20, Ley de 1915 de Oklahoma declara que las desmotadoras de algodón son compañías de servicio público (*public utilities*) y su uso un negocio público; prohibe que una desmotadora opere sin una licencia del State Corporation Commission; autoriza a dicha Comisión a rehusar otorgar dicha licencia cuando no estime que hay necesidad para la desmotadora en la localidad; le concede a la Comisión el poder de reglamentar las desmotadoras en cuanto a deberes públicos y tarifas, y corrección de abusos y discrímenes. El estatuto fué interpretado en los casos de *Sims* v. *State*, 196 Pac. 132; *Planters' Cotton & Ginning Co.* v. *West Bros.*, 198 Pac. 855;

*Frost* v. *Corporation Commission*, 278 U. S. 515; *Chickasha Cotton Oil Co.* v. *Cotton County Gin Co.*, 40 F. (2d) 846. En el caso de Sims la corte asumió la validez de la ley y sostuvo la autoridad de la Comisión para imponer ciertas tarifas; en el de West Bros. la corte volvió à asumir la validez de la ley y sostuvo el poder de la Comisión para ordenar que una compañía que estaba dedicada a servir al público descontinuara ciertas prácticas monopolísticas y discriminatorias; en el de Frost, el Tribunal Supremo Nacional y las partes asumieron la validez de la ley; en el de Chickasha la corte expresamente sostuvo la validez de la ley.

Ninguno de estos casos decide el punto que presenta el de àutos de si a la apelante puede exigírsele una franquicia, de acuerdo con los términos de la Ley núm. 221, por sostener ella que toda vez que la "Central El Ejemplo" no muele cañas del público en general, su negocio no está incluído entre aquellos que están dedicados a un uso público. Somos de opinión que el argumento no puede prevàlecer frente a las doctrinas anteriormente expuestas. Es el interés público el que puede en tal forma substancial afectar a un negocio, no importa que esté dedicado a un uso público o no, que es ese interés de la comunidad en general el que debe prevalecer. La propia apelante acepta la autoridad de la Legislatura para reglamentar su negocio en cuanto a precios, contratación y horas y salarios. ¿Puede pedirse mayor indicio del gran interés público de que está afectada la molienda por parte de la apelante de sus propias cañas? Más aún, la central de la apelante no se dedica a manufacturar o elaborar azúcar para su propio consumo, sino para venderlo en competencia con el azúcar producido por otras compañías azucareras. De la actividad industrial y económica de todas esas compañías, incluyendo la apelante, depende, de un modo vital, el bienestar general de una gran parte de la comunidad puertorriqueña. Sería absurdo sostener que el interés público en la industria azucarera se circunscribe tan sólo a la

fase de la molienda de cañas de algunas centrales y de otras no, dependiendo dicho interés público en que las cañas molidas pertenezcan a los colonos o a las centrales. Mientras la apelante se dedique a la producción y molienda de cañas para la venta pública del azúcar que dichas cañas producen, todas sus actividades son de interés público y por tanto sujetas a reglamentación razonable. Por pequeño que sea el eslabón que la "Central El Ejemplo" represente en la cadena de la industria azucarera, ese eslabón afecta, en forma proporcional, la economía del distrito en que esté localizada y del país en general. Excluir a la apelante de los términos de la Ley núm. 221 equivaldría a reconocer que ello puede, por sí, debilitar la reglamentación que la legislatura quiso imponer a toda la industria azucarera en general.

Como bien se dijera en el caso de Nebbia, cuando los intereses privados están encontrados con los intereses públicos, y sujetos únicamente a garantías constitucionales, el interés público debe prevalecer. "La Constitución no garantiza el privilegio sin restricción de dedicarse a un negocio o de conducirlo como uno desee." (Pág. 527.) Igual declaración encontramos en el caso de *Frost* v. *Corporation Commission,* supra, pág. 521, donde refiriéndose a las condiciones existentes en la industria de las desmotadoras de algodón la corte dijo: "Bajo estas condiciones el dedicarse al negocio no es una cuestión de derecho corriente, sino un privilegio." Y dicho caso decide que aunque la ley de Oklahoma declaraba que lo que se exigía era una licencia, de hecho el privilegio que se otorgaba era una franquicia.

Recientemente, en el caso de *Wickard* v. *Filburn,* 317 U.S. 111, el Supremo Nacional decidió que el Congreso tenía autoridad para imponerle una cuota para la producción de trigo a un agricultor que sólo producía trigo para su propio consumo, por la razón de que dicho agricultor era a la vez un consumidor, y sus requerimientos, si eran totalmente satisfechos por su propia producción, tendían a influir en

forma sustancial el alcance global del estatuto. Véanse también los casos de *Bandini Co.* v. *Superior Court,* 284 U.S. 8, y *Champlin Rfg. Co.* v. *Commission,* 286 U. S. 210, sosteniendo la validez de estatutos que restringían la producción de gas y aceite por entidades privadas como medidas para la conservación de los recursos naturales del estado.

A nuestro juicio las doctrinas expuestas en la opinión disidente del Juez Brandeis en *New State Ice Co.* v. *Liebmann,* supra, son las que deben prevalecer en relación con la industria azucarera de Puerto Rico. Pero es más, aun la opinión de la mayoría del Tribunal en dicho caso al anular la ley hizo constar que la industria del hielo no era *"una industria primordial de la cual dependiera la prosperidad de todo el estado."* (Bastardillas nuestras.) Así vemos que el Juez Brandeis haciendo uso de esta frase dice que el concepto de una empresa de servicio público "no es estático" y que el bienestar de la comunidad puede requerir que el negocio de suplir hielo sea convertido en una empresa de servicio público "tanto como el negocio de suplir agua o *cualquier otro* artículo de comercio o servicios necesarios." (Bastardillas nuestras.) No creemos que nadie pueda dudar que la prosperidad de todo Puerto Rico depende en gran parte de la industria azucarera. De manera que, no sólo a base de la opinión disidente del Juez Brandeis en dicho caso, sino que aun por el fundamento expuesto por la mayoría del Tribunal está justificado el poder que reconocemos a la Legislatura. De nuevo citamos de la opinión del Juez Brandeis en cuanto expone los motivos de carácter económico que hacían razonable exigir una franquicia para dedicarse al negocio del hielo:

"El propósito de requerirla (una franquicia) es promover el interés público a evitar desperdicio. Especialmente en aquellos negocios en los cuales los cargos de interés y depreciación sobre la planta constituyen un elemento alto en el costo de producción, la experiencia ha demostrado que la carga financiera incidental a una

duplicidad innecesaria de facilidades pueden traer tarifas altas y mal servicio. Ahí el costo depende usualmente, entre otras cosas, en el volumen y la división de posibles adquirentes entre compañías competidoras puede en tal forma elevar el costo por unidad de operación que haría imposible proveer servicio adecuado a precios razonables.''

La prueba en el caso de autos demostró que si bien la apelante tiene una capacidad de molienda de 140,000 toneladas sólo está moliendo unas 90,000 toneladas. He aquí una demostración del elemento de desperdicio en la capacidad industrial de la Central de la apelante, que señala Brandeis, el cual puede ser evitado exigiéndole que obtenga una franquicia. Y esto es así si tomamos en consideración el artículo 42 de la Ley núm. 221(⁸), que obliga a la Comisión de Servicio Público a determinar las zonas de producción de todas las centrales debiendo hacerse constar, de acuerdo con el artículo 43(⁹), en la franquicia que se conceda a cada central dicha zona de producción. Esta determinación es una de las bases fundamentales de la Ley núm. 221. El artículo 4 de dicha ley define lo que significa la expresión ''zona de producción'' como ''la demarcación territorial dentro de cuyos límites se cultiva la caña de azúcar a ser convertida en azúcar crudo o en azúcar refinado o que en efecto se convierta en azúcar crudo o en azúcar refinado por cualquier compañía azucarera o por cualquier persona natural o jurídica dedicada a la manufactura, producción, elaboración o refinación de azúcar.''

---

(⁸) ''Artículo 42.—Dentro de un año, a contar desde la fecha de aprobación de esta Ley, la Comisión procederá a determinar y poner en vigor la zona de producción de toda compañía azucarera y de toda persona natural o jurídica que en Puerto Rico se dedique a la manufactura, elaboración o refinación de azúcar.''
''         .         .         .         .         .         ''
(⁹) ''Artículo 43.—En toda franquicia final que la Comisión concediere a cualquier persona natural o jurídica o a cualquier compañía azucarera se determinará la zona de producción de la entidad concesionaria de tal franquicia y ninguna persona natural o jurídica o compañía azucarera podrá elaborar o refinar azúcar usando como materia prima cañas de azúcar producidas fuera de la zona de producción que le fuere asignada en la franquicia concedídale.''

Si la determinación de la zona de producción que corresponda a la apelante, cuando sea hecha por la Comisión de Servicio Público, es razonable o no, es cuestión que en el momento oportuno podría ser resuelta por las cortes, al igual que cualquier otra reglamentación o disposición contenida en la franquicia. El hecho de que la apelante esté obligada a solicitar y obtener dicha franquicia no significa que esté igualmente obligada a aceptar cualquiera o todos los términos y condiciones que dicha franquicia contenga. La legalidad de toda la reglamentación a que pueda ser sometida estará siempre sujeta a investigación y determinación judicial. Véase *South P. R. Sugar Co.* v. *Corte*, y *Antonio Roig Sucrs., S. en C.,* v. *Corte*, resueltos en enero 19, 1944, 62 D.P.R. 841.

No hemos dejado de considerar toda la jurisprudencia citada por la apelante en relación con la falta de poder en la Legislatura para declarar un negocio privado como uno de servicio público. *Los Pipe Line Cases,* 234 U. S. 548; *Producers Transportation Co.* v. *R. R. Comm.,* 251 U. S. 228; *Weems Steamboat Co.* v. *People's Co.,* 214 U. S. 345 y otros. Empero, somos de opinión que los negocios y las industrias de que se trataba en dichos casos—oleoductos, muelles, porteadores privados, etc.—de importancia relativa en la economía general del Estado o de la nación, no guardan analogía con la situación que presenta la industria azucarera de Puerto Rico. Además, como ha dicho el Juez Stone, concurriendo con él el Juez Cardozo: "La doctrina de *stare decisis,* no importa cuán apropiada o aun necesaria en ciertas ocasiones, sólo tiene una aplicación limitada en el campo del derecho constitucional." [10]

La Ley núm. 221, supra, es una secuela de la reglamentación limitada anterior a que fué sometida la misma industria en cuanto a las relaciones, derechos y deberes de las centrales con sus colonos. Nos referimos a la Ley núm. 112 de mayo 13, 1937, según enmendada en fecha posterior y

---

[10] *St. Joseph Stockyard Co.* v. *U. S.,* 298 U. S. 38, 94 (1936).

ahora derogada por la núm. 221. La Legislatura ha querido afrontar el problema global convirtiendo la industria de manufacturar azúcar en empresa de servicio público sometiéndola en su totalidad a la reglamentación de la Comisión de Servicio Público. Al ejercitar este poder, somos de opinión que no ha violado la cláusula sobre debido procedimiento de ley de nuestra Carta Orgánica.

La molienda de cañas de azúcar constituye en la actualidad la industria principal de Puerto Rico. Nuestros problemas económicos más importantes giran y dependen generalmente del éxito o fracaso de dicha industria. Puede afirmarse que nuestra economía depende en forma muy substancial de ella. La Ley núm. 221, no hay duda alguna, es un experimento legislativo dentro de la legislación social moderna que tiende a modificar la política del *laissez faire*. La experiencia ha demostrado, con dolorosos y a veces trágicos resultados, que dicha política no ha resuelto adecuadamente nuestros serios y complicados problemas económicos y sociales. No tenemos duda tampoco de que el éxito o fracaso de esta experimentación depende en grado sumo de la eficiencia, honradez y laboriosidad de aquellos en cuyas manos se ha puesto: la Comisión de Servicio Público. Problema es éste, sin embargo, que compete afrontar a la rama ejecutiva de nuestro gobierno y no a las cortes. Tampoco debe la rama judicial poner trabas a la legislatura para que, en el ejercicio de su poder gubernamental o de policía, adopte aquella legislación que, a su juicio, pueda resolver en forma substancial dichos problemas.

Por el cuarto señalamiento la apelante alega que la corte inferior erró al decretar el injunction preliminar por no haberse probado por el peticionario el elemento de daños irreparables. Carece de méritos la cuestión. No se trata de un injunction bajo la jurisdicción de equidad de la corte, sino de uno autorizado por el artículo 55 de la Ley núm. 221, supra, que no requiere ni alegación ni prueba de dichos daños, y sí la determinación de si alguna persona natural o jurí-

dica está violando las disposiciones del estatuto o de las órdenes de la Comisión y en ese caso impedir que continúen dichas infracciones.  Véase *U. S.* v. *San Francisco*, 310 U. S. 16, y *Brown* v. *The Hetch Co.*, resuelto por la Corte de Apelaciones del Distrito de Columbia en julio 22 de 1943.

*Debe confirmarse la sentencia apelada.*