EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Brito Díaz; Ángel Luis Sanabria Morales; Keila Colón Rivera; José C. Rodríguez Collazo; José Enrique Cruz Mercado; Nydia Luz Rivera Laporte; Marianita Palau; Carla Capalli Rosa; Ángel Torres y People Fort The Ethical Treatment of Animals (PETA)<br><br>    Recurridos<br><br>               v.<br><br>Bioculture Puerto Rico, Inc.; Estado Libre Asociado de Puerto Rico; Administración de Reglamentos y Permisos (ARPE); Departamento de Justicia; Junta de Calidad Ambiental (JCA); Departamento de Recursos Naturales y Ambientales (DRNA); Departamento de Agricultura; Compañía de Fomento Industrial (PRIDCO); Municipio de Guayama; Ing. José Mateo Colón; e Ing. Germán Torres Berríos<br><br>    Peticionarios | Certiorari<br><br>2011 TSPR 185<br><br>183 DPR ____ |

Número del Caso: CC-2011-929
              CC-2011-931


Fecha: 9 de diciembre de 2011


Tribunal de Apelaciones:

       Región Judicial de Arecibo, Guayama y Utuado, Panel Especial XI


Juez Ponente:

       Hon. Luis G. Saavedra Serrano

**CC-2011-929**

Abogados de la Parte Peticionaria:

        Lcdo. Luis Sánchez Betances
        Lcdo. Jorge Martínez Luciano
        Lcdo. Emil Rodríguez Escudero

Abogados de la Parte Recurrida:

        Lcdo. Ricardo F. Casellas
        Lcdo. César T. Alcover Acosta
        Lcdo. Manuel Pietrantoni Cabrera
        Lcdo. Segundo Meléndez
        Lcdo. José Juan Nazario

_____

**CC-2011-931**

Oficina del Procurador General:

        Lcda. Karla Pacheco Álvarez
        Procuradora General Auxiliar

Abogados de la Parte Recurrida:

        Lcdo. Ricardo F. Casellas
        Lcdo. César T. Alcover Acosta
        Lcdo. Manuel Pietrantoni Cabrera
        Lcdo. Segundo Meléndez
        Lcdo. José Juan Nazario

Materia:   Injuction Preliminar y Permanente y Remedios Provisionales

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Brito Díaz; Ángel Luis Sanabria Morales; Keila Colón Rivera; José C. Rodríguez Collazo; José Enrique Cruz Mercado; Nydia Luz Rivera Laporte; Marianita Palau; Carla Capalli Rosa; Ángel Torres y People Fort The Ethical Treatment of Animals (PETA)<br><br>Recurridos<br><br>v.<br><br>Bioculture Puerto Rico, Inc.; Estado Libre Asociado de Puerto Rico; Administración de Reglamentos y Permisos (ARPE); Departamento de Justicia; Junta de Calidad Ambiental (JCA); Departamento de Recursos Naturales y Ambientales (DRNA); Departamento de Agricultura; Compañía de Fomento Industrial (PRIDCO); Municipio de Guayama; Ing. José Mateo Colón; e Ing. Germán Torres Berríos<br><br>Peticionarios | CC-2011-929<br>CC-2011-931 |

RESOLUCIÓN

En San Juan, Puerto Rico, a 9 de diciembre de 2011.

A las mociones en auxilio de jurisdicción, a la moción en solicitud de autorización para comparecer como *amicus curiae* y a los recursos de certiorari en los casos de epígrafe, no ha lugar.

Notifíquese inmediatamente a las partes por teléfono, fax y por la vía ordinaria.

Lo acordó y ordena el Tribunal, y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor

Martínez Torres emitió voto de conformidad al cual se le unió el Juez Asociado señor Kolthoff Caraballo. El Juez Asociado señor Estrella Martínez emitió voto particular de conformidad al cual se le unieron el Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez. La Jueza Asociada señora Pabón Charneco emitió voto particular disidente al cual se le unieron los Jueces Asociados señor Rivera García y señor Feliberti Cintrón.

La Jueza Asociada señora Pabón Charneco, el Juez Asociado señor Rivera García y el Juez Asociado señor Feliberti Cintrón declararían con lugar la moción en solicitud de autorización para comparecer como *amicus curiae*.

Aida Ileana Oquendo Gralau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Brito Díaz; Ángel Luis Sanabria Morales; Keila Colón Rivera; José C. Rodríguez Collazo; José Enrique Cruz Mercado; Nydia Luz Rivera Laporte; Marianita Palau; Carla Capalli Rosa; Ángel Torres y People Fort The Ethical Treatment of Animals (PETA)<br><br>Recurridos<br><br>v.<br><br>Bioculture Puerto Rico, Inc.; Estado Libre Asociado de Puerto Rico; Administración de Reglamentos y Permisos (ARPE); Departamento de Justicia; Junta de Calidad Ambiental (JCA); Departamento de Recursos Naturales y Ambientales (DRNA); Departamento de Agricultura; Compañía de Fomento Industrial (PRIDCO); Municipio de Guayama; Ing. José Mateo Colón; e Ing. Germán Torres Berríos<br><br>Peticionarios | CC-2011-929<br>CC-2011-931 |

Voto de Conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES a la cual se une el Juez Asociado señor KOLTHOFF CARABALLO

En San Juan, Puerto Rico, a 9 de diciembre de 2011.

En esta ocasión debemos analizar si procede un recurso de _injunction_ para paralizar una obra en la que el permiso de construcción está impugnado ante la Junta

Revisora de Permisos y Uso de Terrenos. [1] Como entiendo que procede el _injunction_, voto conforme con la decisión de este Foro de declarar no ha lugar los recursos presentados.

I

La empresa Bioculture Ltd. se especializa en la crianza de primates, en particular, del macaco cangrejero. Estos primates son vendidos a empresas de desarrollo de nuevas tecnologías en la industria farmacéutica, biomédica y de alimentos. En el 2008 esta compañía se registró en el Departamento de Estado como Bioculture Puerto Rico, Inc., con el fin de comenzar sus operaciones en la Isla.

Con el aval de la Compañía de Fomento Industrial, Bioculture comenzó a gestionar una serie de permisos para la construcción de sus instalaciones en el barrio "Pozo Hondo", en el Municipio de Guayama. Para ello, contrató al Ingeniero José A. Mateo Colón. El 19 de diciembre de 2008 la Administración de Reglamentos y Permisos (A.R.Pe.) le expidió el permiso de construcción número 08CX2-CET-07702 a Bioculture. La construcción del centro de primates comenzó en febrero de 2009. En reacción a la expedición del permiso, un grupo de residentes del Municipio de Guayama manifestó su oposición al proyecto.

---

[1] La Junta Revisora de Permisos y Uso de Terrenos es la sucesora para todos los fines legales de la Junta de Apelación sobre Construcciones y Lotificaciones. Sin embargo, en la relación de hechos se hará referencia a esta última porque era la que existía en el momento en que el caso se dilucidó. Art. 11.11 de la Ley Núm. 161-2009, 23 L.P.R.A. sec. 9021j.

El 22 de abril de 2009 el demandante Roberto Brito Díaz instó una querella ante A.R.Pe. El 15 de mayo de 2009 esta agencia ordenó la paralización del proyecto, luego de identificar algunas deficiencias en el trámite de la expedición del permiso original. Posteriormente, Bioculture presentó una nueva solicitud de permiso el 15 de junio de 2009, esta vez acompañada de un Memorial Explicativo preparado por el Ingeniero Germán Torres Berríos. La A.R.Pe. aprobó ese nuevo permiso y lo notificó el 18 de junio de 2009.

El 21 de julio de 2009 el Sr. Brito Díaz y otros presentaron un recurso de revisión oportuno ante la Junta de Apelaciones sobre Construcciones y Lotificaciones (J.A.C.L.). Solicitaron la revocación del permiso expedido por A.R.Pe. a Bioculture y la paralización inmediata de las obras de construcción. En oposición a esa apelación, Bioculture presentó una Solicitud de Desestimación en la que adujo que los apelantes carecían de legitimación activa. La resolución de la controversia se encuentra pendiente aún en ese organismo.

Por otro lado, el 21 de agosto de 2009 los apelados presentaron ante el Tribunal de Primera Instancia una "Solicitud de Interdicto Preliminar y/o Permanente y Remedios Provisionales" contra Bioculture, A.R.Pe., la Junta de Calidad Ambiental (J.C.A.), el Municipio de Guayama, el ingeniero Mateo Colón y el ingeniero Torres Berríos.

En su solicitud de interdicto, el señor Brito Díaz y otros alegaron que el proyecto de Bioculture se construía en terrenos reservados para la construcción de una carretera conocida como la PR-711. Además, manifestaron que el uso que se le pretende dar al proyecto sería de naturaleza industrial y, por lo tanto, no era cónsono con el uso estipulado para la calificación del área donde iba a ser construido. El predio estaba zonificado como área Rural General (R-G), por lo que se requería una consulta de ubicación al amparo del Reglamento Núm. 4 de la Junta de Planificación, aprobado el 11 de enero de 2009.

Por último, indicaron que por el impacto y riesgo significativo al ambiente que a su juicio representaba el proyecto, era necesaria la preparación de una Declaración de Impacto Ambiental, conforme a la Ley de Política Pública Ambiental, Ley Núm. 416-2004, 12 L.P.R.A. sec. 8001 *y ss*.

Además, el 28 de septiembre de 2009 el señor Brito Díaz y otros presentaron una "Solicitud de Interdicto Preliminar y/o Permanente y Remedios Provisionales Enmendada" para, entre otras cosas, añadir una acción bajo el procedimiento especial contemplado en el luego derogado Artículo 28 de la Ley Orgánica de A.R.Pe., 23 L.P.R.A. sec. 72.

El 23 de diciembre de 2009 el foro primario emitió una sentencia en la que ordenó la paralización inmediata de la construcción del centro de primates. Fundamentó su

decisión en que la crianza de monos no era una actividad agrícola o agropecuaria, por lo que el uso propuesto no es conforme a los permitidos para un distrito clasificado como R-G.

En desacuerdo con esa decisión, Bioculture y el Estado apelaron el 27 de enero de 2010. Luego de consolidar ambos recursos, el foro apelativo intermedio confirmó la decisión del Tribunal de Primera Instancia de otorgar el interdicto especial contemplado en el Art. 28 de la Ley Núm. 76, supra.

Inconformes, Bioculture y el Estado nos solicitan mediante recursos de certiorari que revoquemos a los foros recurridos, y en consecuencia, dejemos sin efecto el injunction especial.

II

A

En Plaza Las Américas v. N & H, 166 D.P.R. 631, 654 (2005), mencionamos que "[l]a plena validez de los permisos que concede A.R.Pe. está sujeta a ciertas condiciones". Precisamente el Art. 31 de la Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 72(c), discutido en Plaza Las Américas, supra, vigente al dilucidarse esta controversia, establecía un plazo de 30 días para instar una apelación ante la J.A.C.L. En particular, el Art. 31 de la Ley Núm. 76, supra, disponía que una vez se presenta el escrito de apelación ante la J.A.C.L. y se notifica, "el organismo o funcionario de cuya actuación se apela,

suspenderá todos los procedimientos ante sí, relativos a la actuación, determinación, o resolución de la cual se apela".

Relacionado con lo anterior, precisa recordar que en Fuertes, Guillermety v. A.R.Pe., 130 D.P.R. 971, 981-982 (1992), mencionamos que la expedición de un permiso antes de que transcurran los 30 días que otorga el Art. 31 para apelar la resolución de A.R.Pe. que lo autoriza es ultra vires. Por lo tanto, una vez iniciada una apelación ante la J.A.C.L., los procedimientos ante A.R.Pe. se paralizan. Plaza Las Américas v. N & H, supra, pág. 655, citando a Fuertes, Guillermety v. A.R.Pe., supra, pág. 981-892. En el caso que nos ocupa, Roberto Brito Díaz y otros presentaron una apelación ante la J.A.C.L. dentro del término de 30 días que disponía el Art. 31 de la Ley Núm. 76, supra. Con ello, se suspendió la eficacia del permiso concedido. No es el Tribunal de Primera Instancia el que invalidó el permiso concedido. Su vigencia estaba suspendida por mandato del Art. 31 de la Ley Núm. 76, íd. El tribunal se limitó a hacer cumplir ese mandato y evitar una construcción ilegal, como disponía el Art. 28, supra. Por eso me asombra que la disidencia ni tan siquiera mencione el Art. 31, supra.

B

Como marco doctrinal introductorio, es necesario puntualizar que en A.R.Pe. v. Rodríguez, 127 D.P.R, 793, 806-807 (1991), señalamos que la intención del legislador

al aprobar el Art. 28 de la Ley Núm. 76, supra, fue crear

un procedimiento sumario. En específico, expresamos que el

Informe de la Comisión de lo Jurídico de la Cámara de

Representantes respecto al P. de la C. 1065, Diario de

Sesiones, Sesión Ordinaria 1953, Vol. II, Tomo II, pág.

1520, dispone:

> El proyecto tiene por finalidad hacer aquellas reformas en la legislación, reglamentación y trámite relacionadas con los permisos de construcción que la experiencia ha ido señalando es conveniente realizar para aclimatar dicha legislación y reglamentación a las condiciones reales de Puerto Rico. Se agrega más adelante: "El procedimiento de imponer multas diarias no ha dado resultado efectivo en la práctica para evitar las construcciones clandestinas y en sustitución del mismo en el Proyecto se establece un procedimiento especial mediante el cual se podría ordenar la paralización inmediata de obras clandestinas. Dicho procedimiento concede la oportunidad, a colindantes y vecinos que puedan ser afectados, de instar el mismo. Mediante ese procedimiento, a petición jurada ante un juez del Tribunal de Primera Instancia de Puerto Rico de que se está construyendo una obra clandestina e identificando la misma y las personas violadoras, se puede obtener una orden provisional del tribunal dirigida a dichas personas requiriéndolas para que paralicen inmediatamente, bajo apercibimiento de desacato, la obra a que la petición se refiere, hasta tanto se ventile judicialmente su derecho. Se establece el trámite para este nuevo procedimiento el cual es sumamente rápido, económico y en beneficio de ambas partes.

Así pues, el Art. 28 de la Ley Núm. 76, supra,

estableció un "mecanismo estatutario, independiente,

especial, sumario y limitado... [cuyo] propósito es hacer

viable mediante la paralización de usos y obras, la

efectividad de las leyes y los reglamentos de

planificación cuyo cumplimiento A.R.Pe. está obligada a fiscalizar". Plaza Las Américas v. N & H, supra, pág. 646.

No podemos separar los conceptos construcción y uso. La ley no concibe que se conceda un permiso de construcción enajenado del uso que se le va a proporcionar a la edificación construida. Después de todo, nadie construye en el abstracto. Por eso, el Art. 28, supra, derogado fue conceptualizado para paralizar "cualquier **edificio o uso**, hechos o mantenidos en violación de este capítulo o de cualesquiera reglamentos adoptados conforme a la ley y cuya estructuración le haya sido encomendada a la Administración". (Énfasis suplido.) Art. 28, íd. La intención legislativa fue "establecer un mecanismo sumario rápido, limitado a la obtención de órdenes para la paralización inmediata, provisional o permanente, **de obras o usos contrarios a la ley**". (Énfasis suplido.) A.R.Pe. v. Rodríguez, supra, págs. 807-808.

De igual manera, el Art. 28, supra, facultaba al administrador de A.R.Pe., al Secretario de Justicia, vecinos, propietarios u ocupantes perjudicados o que podrían ser perjudicados, a instar recursos de interdicto, mandamus, nulidad y cualquiera otra acción adecuada o remedio disponible en ley para impedir, prohibir, anular, vacar, remover o demoler cualquier edificio o uso que fuere construido o mantenido en violación a la ley de

A.R.Pe.[2] A su vez, el artículo reglamentó el aspecto procesal que se tiene que cumplir para que el remedio solicitado proceda.

El procedimiento especial consagrado en el Art. 28, supra, lo podía utilizar una parte legitimada que mediante una petición jurada asegurase que determinada persona realizaba un uso u obra que violaba una ley o reglamento de planificación que a la A.R.Pe. le correspondía fiscalizar. La ley disponía que una vez una parte legitimada invoca este procedimiento "el tribunal paralizará provisionalmente la obra o uso, y cumplido los demás requisitos enumerados en el estatuto, determinará si ha ocurrido la violación alegada. En tal caso, se ordenará la paralización permanente del uso u obra, sujeta a las formas y condiciones que especifica el Art. 28". Plaza Las Américas v. N & H, supra, pág. 647.

Sin embargo, no debemos olvidar que el procedimiento especial consagrado en el Art. 28, supra, no desplaza la función administrativa ya que se trata de un mecanismo

---

[2] El procedimiento para impugnar construcciones y usos ilegales al amparo de la nueva Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009, 23 L.P.R.A. secs. 9024-9024c, varía del dispuesto en el Art. 28, supra, derogado. Ahora se establece que toda querella debe presentarse ante el Inspector General. Si luego de la investigación, éste decide ejercer sus facultades, puede solicitar la revocación del permiso, o la paralización de obras o usos no autorizados, para lo cual deberá obtener una orden judicial. Ahora bien, si el inspector no actúa dentro del término de quince días laborables, el querellante podrá acudir al tribunal a solicitar los remedios antes mencionados. Íd.

provisional que requiere de una acción ulterior e independiente para adjudicar finalmente la controversia. Íd. Además, ese procedimiento "no está sujeto a las normas de jurisdicción primaria ni agotamiento de remedios administrativos". Íd.

III

Según el Art. 28, supra, la parte que interesare utilizar el remedio dispuesto en ese artículo tenía que demostrar que estaba afectada por la construcción o uso ilegal. Es decir, tenía que establecer que contaba con legitimación activa para instar el pleito judicial. Ese criterio es cónsono con nuestros pronunciamientos en Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010).

Una lectura detenida de nuestra Opinión en Fund. Surfrider y otros v. A.R.Pe., íd., demuestra que la norma de justiciabilidad que recoge la Sec. 4.2 de la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2172, y que interpretamos en ese caso, se fundamenta en la limitación constitucional que tienen los tribunales para atender solamente casos y controversias reales. Fund. Surfrider y otros v. A.R.Pe., supra, págs. 574. Señalamos entonces que la parte que acude al tribunal tiene que demostrar "un interés sustancial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administrativa que se impugna...". Fund. Surfrider y otros v. A.R.Pe., supra, pág. 579. Inmediatamente, citando E.L.A. v. Aguayo, 80 D.P.R. 552,

558-559 (1958), reafirmamos la base constitucional de esta regla al afirmar que el requisito procesal indicado "asegura que resolvamos 'controversias genuinas surgidas entre partes opuestas que tienen un interés real de obtener un remedio que haya de afectar sus relaciones jurídicas' ". Fund. Surfrider y otros v. A.R.Pe., supra, págs. 571-572.

Es por esto que rechazo vehementemente el análisis de Fund. Surfrider y otros v. A.R.Pe., íd., que el hermano Juez Asociado señor Estrella Martínez realiza en su Voto de Conformidad. No se puede concebir el Art. 28, supra, como una llave maestra que permita que cualquier persona obvie los requisitos constitucionales de justiciabilidad y paralice la construcción de obras. La Asamblea Legislativa no tiene la facultad de relevarnos de las limitaciones de justiciabilidad que la Constitución nos impone y que reconocimos en Fund. Surfrider y otros v. A.R.Pe., supra, y E.L.A. v. Aguayo, supra. El legislador no puede facultarnos a emitir opiniones consultivas. Por la misma razón tampoco puede crear una acción judicial que esté divorciada del principio de legitimación activa.

Ahora bien, se desprende de nuestros pronunciamientos en Plaza Las Américas v. N & H, supra, pág. 647, que bastaba con que uno de los peticionarios del procedimiento del Art. 28 tuviera legitimación activa para que pudiera solicitar el injunction. Esto también es consecuente con lo resuelto en Fund. Surfrider y otros v. A.R.Pe., supra.

En este caso, varios vecinos de Guayama figuran como demandantes, junto a la organización *People for the Ethical Treatment of Animals* (P.E.T.A.). A esta última se le reconoció legitimación activa para demandar porque uno de los recurridos alegó que es miembro de la organización.

A base de los requisitos constitucionales para establecer un caso y controversia, que explicamos en <u>Fund. Surfrider y otros v. A.R.Pe.</u>, íd., estas personas y P.E.T.A. no tienen legitimación activa para reclamar en el tribunal. Los individuos no establecieron que sufrieron daños reales y específicos debido a la construcción que Bioculture lleva a cabo. Se limitaron a alegar daños a la población general y a especular por la ansiedad y la angustia que supuestamente les provoca el destino de los animales que Bioculture alojará en las instalaciones en construcción. Por la misma razón, P.E.T.A. tampoco demostró tener un daño claro, palpable real, inmediato, preciso, que no sea general, abstracto, hipotético o especulativo. Además, si ninguno de los miembros de la organización tiene legitimación activa la entidad tampoco puede demandar a su nombre. <u>Fund. Surfrider y otros v. A.R.Pe.</u>, íd., págs. 572-573; <u>Col. Ópticos de P.R. v. Vani Visual Center</u>, 124 D.P.R. 559 (1989). Al respecto, P.E.T.A. y la mayoría de los recurridos no se diferencian de la fundación y el "vecino" a quienes no le reconocimos legitimación activa en <u>Fund. Surfrider y otros v. A.R.Pe.</u>, <u>supra</u>.

Ahora bien, luego de un análisis minucioso de las transcripciones de las vistas celebradas ante el foro primario, es forzoso concluir que el Sr. José Rodríguez Collazo ostenta legitimación activa. Su finca colinda en un extremo con la de Bioculture. <u>Transcripción de Vista Evidenciaria de 9 de noviembre de 2009</u>, pág. 78. En particular, este colindante del proyecto testificó que no ha podido vender parte de su propiedad debido a que tres compradores potenciales se arrepintieron tras enterarse de la construcción de las instalaciones de Bioculture:

> P   ...¿Por qué más usted demandó? Concretamente[, ¿]que [sic] daño le causó a usted la construcción que lleva a cabo...
> R   Me causa el daño, que cuando usted me dijo primero, yo desarrollé un proyecto allí...
> P   Ajá.
> R   A la cual yo le pus[e] agua...
> P   Unjú.
> R   Luz, carretera, y **tenía tres comprador[es] de par de esos solares y cuando escucharon de la cosa esta de los monos, después se me arrepintieron. Y los tengo allí, mire muertos de la risa.**
>     ...
> P   Okey. O sea, la razón por [la] cual usted radicó este pleito es porque según usted, usted no pudo vender un desarrollo de vivienda urbano, [¿]esa es su razón[?]
> R   **S[í]**.... [Énfasis suplido.]

<u>Transcripción</u>, íd., págs. 98, 100.

Con esta declaración incontrovertida, el señor Rodríguez Collazo demostró tener un daño económico claro, real, concreto y específico. Aunque más adelante señaló en contrainterrogatorio que los edificios de Bioculture, por sí solos, no le molestan (transcripción, pág. 101), dejó establecido el daño económico que la construcción le

causó, sin que la otra parte presentara prueba en contrario. Esa prueba directa, que el juzgador creyó, es suficiente para probar ese daño. Regla 110(D) de Evidencia, 32 L.P.R.A. Ap. VI; S.L.G. Rivera Carrasquillo v. A.A.A., 177 D.P.R. 345, 357 (2009); Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799, 811 (2009); Trinidad v. Chade, 153 D.P.R. 280 (2001). Nuestra decisión en Fund. Surfrider y otros v. A.R.Pe., supra, no dejó esa norma sin efecto ni requirió reglas evidenciarias distintas para probar el daño que le da legitimación activa a un reclamante.

Es evidente, entonces, que la norma sentada en Fund. Surfrider y otros v. A.R.Pe., íd., sigue vigente con toda su fuerza. El anuncio de su muerte es una exageración, parafraseando la nota de Mark Twain de mayo de 1897, dirigida al *New York Journal*. Lo que diferencia este caso es que uno de los reclamantes logró probar un daño real, concreto, inminente y preciso, que no es especulativo, abstracto ni generalizado.

Así las cosas, como uno de los recurridos tiene legitimación activa, eso era suficiente para emitir el injunction con el objetivo de que Bioculture paralice la construcción hasta que la J.A.C.L., ahora Junta Revisora de Permisos y Uso de Terrenos, dilucide los méritos de la reclamación presentada ante su consideración.

Ahora bien, tanto el foro primario como el Tribunal de Apelaciones erraron al dilucidar los méritos del

permiso concedido por A.R.Pe. Es decir, fue desacertado analizar y concluir que la clasificación agrícola del uso propuesto para los terrenos de Bioculture no permite la crianza de animales que estén relacionados a la agricultura tradicional. En esta etapa, esa facultad le pertenece exclusivamente a la Junta Revisora de Permisos y Uso de Terrenos. Tampoco está ante nosotros la bondad o daño que se alegan que el proyecto propuesto puede tener. **Lo único que había que dilucidar en el tribunal era si existía una construcción ilegal y si alguien estaba afectado por ella, lo que se probó.** Bioculture está construyendo sin un permiso de construcción final. Eso es contrario a la ley. Por ende, procede el injunction para paralizar la construcción hasta que la Junta Revisora resuelva la apelación en los méritos.

Lo anterior no significa que Bioculture queda impedida permanentemente de construir sus instalaciones. Meramente se mantiene el injunction hasta que la Junta Revisora resuelva. De hecho, si la Junta Revisora y su antecesora, la J.A.C.L., no se hubieran tardado dos años en atender este asunto, el injunction habría sido innecesario.

IV

Debido a que la revisión de una sentencia se da contra la decisión y no contra sus fundamentos, voto conforme con la decisión de este Tribunal de declarar no ha lugar el recurso de certiorari. SLG Semidey Vázquez v. ASIFAL, 177 D.P.R. 657, 693 (2009); Pérez v. VPH Motor Corp., 152 D.P.R. 475, 487 (2000).


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Roberto Brito Díaz; Ángel Luis Sanabria Morales; Keila Colón Rivera; José C. Rodríguez Collazo; José Enrique Cruz Mercado; Nydia Luz Rivera Laporte; Marianita Palau; Carla Capalli Rosa; Ángel Torres; People for the Ethical Treatment of Animals (PETA)<br><br>Recurridos<br><br>v.<br><br>Bioculture Puerto Rico, Inc.; Estado Libre Asociado de Puerto Rico; Administración de Reglamentos y Permisos; Departamento de Justicia; Junta de Calidad Ambiental; Departamento de Recursos Naturales y Ambientales; Departamento de Agricultura; Compañía de Fomento Industrial (PRIDCO); Municipio de Guayama; Ing. José A. Mateo Colón; Ing. Germán Torres Berríos<br><br>Peticionarios | CC-2011-929<br><br><br><br>Cons.<br><br><br><br>CC-2011-931 | Certiorari |

Voto de conformidad emitido por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ al cual se unen el Juez Presidente SEÑOR HERNÁNDEZ DENTON y las Juezas Asociadas SEÑORAS FIOL MATTA Y RODRÍGUEZ RODRÍGUEZ.

San Juan, Puerto Rico, a 9 de diciembre de 2011.

Por considerar que existen justificaciones de interés público que se extienden a las colindancias del proyecto de Bioculture y por entender que los vecinos y colindantes cumplieron con los requisitos para obtener un remedio especial de paralización, estoy conforme con el resultado alcanzado por este Tribunal al denegar la expedición del auto de *certiorari*.

I.

La corporación Bioculture Mauritius Ltd., entidad organizada al amparo de las leyes de la República de Mauricio, se especializa en la crianza de monos de la especie Macaques Fascicularis (macaco cangrejero). Los primates que suple esta compañía son utilizados por empresas de desarrollo de la industria farmacéutica, biomédica y de alimentos. Examinemos los serios errores, deficiencias y el patrón de irregularidades, cometidos por Bioculture Puerto Rico, Inc. (Bioculture) por los cuales diversas agencias de la Rama Ejecutiva emitieron responsablemente el mismo remedio que eventualmente tuvo que adoptar también la Rama Judicial, a saber: la paralización temporera del proyecto de Bioculture.

Con el fin de comenzar operaciones en Puerto Rico, en el 2008 la compañía fue registrada en el Departamento de Estado como Bioculture Puerto Rico, Inc. Ese mismo año la compañía comenzó a gestionar los correspondientes permisos para la construcción de sus facilidades en el barrio Pozo Hondo en el Municipio de Guayama. Así las cosas, el 19 de diciembre de 2008 la Administración de Reglamentos y Permisos (A.R.Pe.) expidió el permiso de construcción. La construcción comenzó en febrero de 2009.

El 22 de abril de 2009 el Sr. Roberto Brito Díaz presentó una querella ante A.R.Pe. Dicha agencia identificó deficiencias en el trámite de la expedición del permiso original. En consecuencia, ordenó la paralización del

proyecto. Más adelante, Bioculture solicitó nuevamente el permiso de construcción, el cual fue otorgado el 18 de junio de 2009. En reacción a la expedición del permiso, un grupo de residentes del Municipio, así como otras organizaciones, manifestaron su oposición al proyecto.

El 21 de julio de 2009 el señor Brito Díaz y otros vecinos del Municipio de Guayama presentaron un recurso de apelación ante la Junta de Apelaciones sobre Construcciones y Lotificaciones (J.A.C.L.), actual Junta Revisora de Permisos y Uso de Terrenos, bajo las disposiciones del Art. 72 de la Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 72 (derogada). Los vecinos solicitaron la revocación del permiso expedido por A.R.Pe. a Bioculture y la paralización inmediata de las obras de construcción. En oposición a esta apelación, Bioculture presentó una solicitud de desestimación, aduciendo que los allí apelantes carecían de legitimación activa. El 14 de septiembre de 2011, Bioculture presentó una moción ante la J.A.C.L. solicitando que se atendiera el recurso, dado que la resolución de la controversia se encuentra aún pendiente en ese organismo.

El 21 de agosto de 2009 los recurridos presentaron ante el Tribunal de Primera Instancia una solicitud de interdicto preliminar y remedios provisionales contra Bioculture, A.R.Pe., la Junta de Calidad Ambiental, el Municipio de Guayama y la Compañía de Fomento Industrial. Alegaron que era necesaria una consulta de ubicación al

amparo del Reglamento Número 4 de la Junta de Planificación, aprobado el 11 de enero de 2009, ya que el uso del proyecto sería de naturaleza industrial. Por ende, no era cónsono con el uso estipulado para la calificación del área donde iba a ser construido. Además, plantearon que se requería una Declaración de Impacto Ambiental, conforme a la Ley de Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, 12 L.P.R.A. sec. 1121 e*t seq.*, debido al riesgo significativo al ambiente que representaba el proyecto. También alegaron que el proyecto de Bioculture estaba siendo construido en terrenos reservados para la construcción de una carretera.

Esta solicitud fue enmendada el 28 de septiembre de 2009. Mediante la referida enmienda añadieron una causa de acción bajo el procedimiento especial que brinda el Art. 28 de la Ley Orgánica de A.R.Pe., Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 71 *et seq.* (derogada). Específicamente, arguyeron la posibilidad de daños físicos, emocionales y de salud a los ciudadanos, además de daños a la agricultura y a la biodiversidad de la Sierra de Cayey, el Bosque Carite, incluyendo la Bahía de Jobos.

Lejos de presentar generalidades, entre otros argumentos, los demandantes plantearon que: (1) confrontan un peligro ineludible a su seguridad y a varios problemas serios de salud; (2) el hábitat quedaría afectado debido al efecto negativo en la agricultura de la zona y a la biodiversidad del área; (3) existe un potencial daño a

cosechas, habida cuenta de que uno de los demandantes es agricultor y su finca de 139 cuerdas colinda con la finca de Bioculture; (4) el proyecto atenta contra la fauna y la flora del área; (5) riesgos de enfermedades infecciosas asociadas a los primates; (6) se trata de un proyecto industrial que ocasionaría ruidos generados por miles de monos enjaulados y que resulta perjudicial a las áreas adyacentes; (7) se trata de una operación de más de 100,000 pies cuadrados no compatible con el distrito en cuestión y que provocaría un problema real de salubridad debido a las heces fecales que generan miles de monos confinados; (8) que los monos que Bioculture importaría, además de ser omnívoros, no son una especie nativa y no son compatibles con el hábitat natural de Puerto Rico, al no contar con depredadores naturales; (9) el problema de propagación de esta plaga es real en Puerto Rico, al punto que el gobierno ha tenido que implantar un programa para lidiar con dicha problemática; (10) el proyecto se está construyendo en una servidumbre de paso de la Carretera PR-711; y (11) el incumplimiento de la Junta de Calidad Ambiental con el Reglamento sobre Declaraciones de Impacto Ambiental.

El 23 de diciembre de 2009, el foro primario dictó una sentencia en la cual ordenó la paralización provisional de la construcción del centro de primates. La decisión estuvo fundamentada en que la crianza de monos no era una actividad agrícola o agropecuaria, por lo que el uso propuesto para el proyecto de Bioculture no era uno

conforme a los permitidos para un distrito clasificado como Rural General (R-G) en la reglamentación aplicable. Por ende, resultaba contrario a derecho que se permitiese mediante certificación de A.R.Pe. la construcción del mismo, ya que se requería llevar a cabo una consulta de ubicación. El foro primario, basándose en la prueba presentada, consideró que los recurridos cumplieron con los requisitos del Art. 28, 23 L.P.R.A. sec. 72, por lo que procedía el remedio de interdicto especial que éste provee, el cual es uno temporero.

Inconformes con el dictamen del Tribunal de Primera Instancia, tanto Bioculture como el E.L.A. presentaron sendos recursos de apelación ante el Tribunal de Apelaciones. En éstos, solicitaron la revocación de la sentencia dictada por el foro primario. Ambos recursos fueron consolidados y el foro apelativo intermedio confirmó la determinación del Tribunal de Primera Instancia, a los efectos de que procedía en derecho otorgar el interdicto especial contemplado en el Art. 28.

Nuevamente inconformes, Bioculture y el E.L.A. nos solicitan que se deje sin efecto el dictamen emitido por el Tribunal de Primera Instancia y confirmado por el Tribunal de Apelaciones.

II.

El caso ante nuestra consideración es uno bajo el Art. 28 de la derogada Ley Núm. 76. Este artículo establecía lo siguiente:

El Administrador o Secretario de Justicia en los casos en los que así se solicite a nombre del Pueblo de Puerto Rico, o de cualquier propietario u ocupante de una propiedad vecina, que resultare o pudiera resultar especialmente perjudicado por cualesquiera de dichas violaciones, además, de otros remedios provistos por ley, podrá entablar recurso de interdicto, mandamus, nulidad o cualquier otra acción adecuada para impedir, prohibir, anular, vacar, remover o demoler cualquier edificio construido, o cualquier edificio o uso, hechos o mantenidos en violación de este capítulo o de cualesquiera reglamentos adoptados conforme a la ley y cuya estructuración le haya sido encomendada a la Administración.

[…]

(c) Tendrán derecho a presentar la petición **los colindantes y vecinos que <u>pudieren</u> ser afectados por la violación** y los funcionarios designados por los organismos gubernamentales que insten la acción, así como ingenieros o arquitectos que actúen como proyectistas o inspectores de la obra. (Énfasis nuestro).

El procedimiento establecido en el mencionado articulado ha sido objeto de interpretación en diversas ocasiones por este Tribunal. El Art. 28 autoriza a entablar el interdicto que provee como remedio para impedir el uso de un edificio o pertenencia en violación de la ley o los reglamentos. <u>A.R.P.E. v. Ozores Pérez</u>, 116 D.P.R. 816, 820 (1986). El procedimiento establecido por el Art. 28 es un mecanismo estatutario, independiente, especial, sumario y limitado que permite la paralización de las obras o usos que violen la ley. Además, viabiliza la efectividad de las leyes y reglamentos que este organismo viene obligado a fiscalizar. <u>A.R.P.E. v. Rodríguez</u>, 127 D.P.R. 793, 808 (1991). En <u>A.R.P.E. v. Ozores Pérez</u>, *supra*, pág. 822, este Tribunal expresó que, en ocasiones, la utilización de los procedimientos sumarios que buscan dar la debida protección a la salud y bienestar público, tal como el establecido en

este articulado, no se circunscribe exclusivamente a situaciones de emergencia. Además, es menester señalar que este mecanismo no desplaza la función administrativa, sino que **es un mecanismo provisional**. Plaza las Américas v. N & H, 166 D.P.R. 631, 647 (2005).

No podemos perder de perspectiva que en el pasado hemos descartado el planteamiento de que las doctrinas de jurisdicción primaria y de agotamiento de remedios administrativos impiden la concesión del remedio sumario del Art. 28. La disponibilidad del procedimiento sumario establecido en el referido Art. 28 no está supeditada a las normas de jurisdicción primaria ni de agotamiento de remedios administrativos. Véase, Mun. de Caguas v. AT&T, 154 D.P.R. 401 (2001).

El procedimiento puede invocarse cuando una parte alega, en petición jurada que: (1) determinada persona está realizando un uso u obra, (2) dicha conducta viola una ley o un reglamento de planificación; y (3) A.R.Pe. tiene la obligación de velar por el cumplimiento de dicha disposición. Plaza las Américas v. N & H, *supra*, pág. 646; A.R.Pe. v. Rivera, 159 D.P.R. 429, 445 (2003). Invocado el procedimiento especial, el tribunal paralizará provisionalmente la obra o uso, y cumplidos los demás requisitos enumerados en el estatuto, determinará si ha ocurrido la violación alegada. Plaza las Américas v. N & H, *supra*, págs. 646-647. De cumplirse con todos los requisitos, el Tribunal ordenará la paralización. Íd.

El propósito del Art. 28 es proveer un mecanismo sumario rápido, independiente y complementario. A.R.P.E. v. Rodríguez, *supra*. Además, las órdenes de paralización solicitadas al amparo del procedimiento especial del Art. 28 **son un remedio independiente y diferente del interdicto tradicional.** Así bien, a diferencia del interdicto tradicional el mecanismo que brinda el Art. 28 no surge de la equidad, sino que debe ser evaluado según la letra del mismo y su jurisprudencia interpretativa. Plaza las Américas v. N & H, *supra*, pág. 650; A.R.Pe. v. Rivera, 159 D.P.R. 429, 444; A.R.Pe. v. Rodríguez, *supra*. Bajo el Art. 28 **no se requiere prueba de daños irreparables**, sino sólo la determinación de que el demandado ha violado las disposiciones de la ley. A.R.Pe. v. Rivera, *supra*; Pueblo v. A. Roig, Sucrs., 63 D.P.R. 18 (1944).

En el caso ante nuestra consideración, los recurridos lograron satisfacer los requisitos del Art. 28 y de su jurisprudencia interpretativa. Los peticionarios, por su parte, nos invitan a adentrarnos en su corriente de errores, lo que conllevaría pasar por alto los claros y reiterados precedentes interpretativos del Art. 28. Ese ejercicio, o más bien omisión, conllevaría también aplicar una jurisprudencia ajena a la naturaleza de ese procedimiento especial, como lo es el caso de Fund. Surfrider y otros v. A.R.P.E., 178 D.P.R. 563 (2010). El citado caso atendió la legitimación activa desde el ámbito general del recurso de revisión judicial provisto en la Ley

Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2101.

No podemos ignorar que nos encontramos ante un procedimiento especial independiente y distinto al tradicional, que no fue objeto de consideración en el citado caso. En Fund. Surfrider y otros v. A.R.P.E., *supra*, los peticionarios intentaron cuestionar una **determinación final** de A.R.Pe. en torno a la aprobación de un proyecto con variaciones a los reglamentos de zonificación. En el caso ante nuestra consideración no nos encontramos en dicha etapa procesal. Equiparar ambas situaciones constituiría desvirtuar la naturaleza del **procedimiento especial que el propio legislador le adscribió al Art. 28.** ¿Por qué utilizar nuestra tinta para alterar los requisitos especiales que el legislador expresamente estableció en el Art. 28 y extender un precedente inexistente al momento de lograr los peticionarios su remedio de paralización? Máxime cuando nos encontramos ante un proyecto que ha sido altamente cuestionado por un informe final proveniente de la propia rama de gobierno que estableció dicho articulado.

Examinemos la prueba desfilada ante el foro primario para disipar cualquier duda en torno a la procedencia del remedio cuestionado.

Los vecinos y colindantes recurridos presentaron el testimonio pericial del Prof. Elías Rodríguez, quien evaluó las solicitudes de permisos de construcción de Bioculture,

a la luz de las normas de planificación aplicables. El perito catalogó la actividad de Bioculture como una industrial. Específicamente, destacó que los monos no se utilizan como alimento, fin de la agricultura. El contexto en el que está planteada la crianza de animales no forma parte de una actividad agrícola. Ciertamente, la crianza de los animales es para propósitos industriales. Véase Transcripción de la Vista del 30 de noviembre de 2009, págs. 44-46.

El perito Elías Rodríguez coincidió con la preocupación del Departamento de Recursos Naturales y Ambientales, al indicar que:

[E]l proyecto propuesto conlleva un efecto detrimental en la biodiversidad de Puerto Rico. Eso no es cualquier persona la que está hablando en esa comunicación. Es la persona que está encargada por ley, el que los puertorriqueños seleccionaron para que protegiera los recursos naturales y el medio ambiente. Y él cumpliendo su función ministerial como Secretario de Recursos Naturales, emite una comunicación diciendo: "Este proyecto tendrá un efecto detrimental". Transcripción de la Vista del 30 de noviembre de 2009, pág. 58.

En torno al impacto ambiental real, el referido perito testificó que:

El siguiente punto… es la existencia de la reserva natural de la Bahía de Jobos. Como yo le dije, la reserva natural de la Bahía de Jobos, forma parte del sistema nacional de reserva, que se utiliza para investigación. Es parte de los acuerdos con los que llegó el Estado Libre Asociado, el gobierno de Puerto Rico con el gobierno federal, cuando se le delegó hacer cumplir la ley de zona de manejo zona costanera, Costa Sur Management Act.… Desde la década del '70, el gobierno de Puerto Rico se comprometió hacer cumplir… dicha disposición. El gobierno de Puerto Rico estableció un plan de manejo de la zona costanera.
…
Por lo tanto, esto es un recurso que está identificado, que tiene una reserva natural que es de alto valor ecológico,

de alta importancia para el país, proteger sus recursos. Y él por si solo, repito lo que dice el AP del reglamento: "Cualquier acción que puede impactar significativamente un área donde exista recursos naturales, es de importancia".

**P ¿Y cómo esta acción puede impactar entonces la Reserva de la Bahía Jobos.**

**La va a contaminar.**

**P ¿Cómo?**

**La va a contaminar con los químicos, con los residuos, con los fecales de los monos, etcétera, que va a estar depositándose sobre el terreno y cuando llueva, la lluvia va a lavar el terreno o se van a estar depositando… infiltrándose a ese acuífero, y el acuífero va a descargar, parte del acuífero va… descargando a la reserva, al Río Seco termina en el área de la Bahía de Jobos.** Es el único tributario, el único río que desemboca en la Bahía de Jobos. Así lo reconoce el plan de manejo de la reserva de la Bahía de Jobos.

**P ¿Y qué relación tiene el Río Seco con la propiedad de Bioculture?**

**La propiedad de Bioculture está dentro de la cuenca geográfica del Río Seco.** La cuenca geográfica es el área superficial de terreno donde la lluvia que cae, termina en el cauce de ese río. Transcripción de la Vista del 30 de noviembre de 2009, págs. 59-61. (Énfasis nuestro.)

Las aguas usadas que pretende utilizar Bioculture también fueron objeto de señalamientos por el perito de los recurridos al testificar lo siguiente:

Aquí el acuífero se va a ver afectado. Y se ve afectado de igual forma. Se ve afectado por los contaminantes que van a llegar al acuífero. Acuérdese que ellos dicen en el memorial explicativo… que de los cuarenta mil (40,000) galones de agua diaria que ellos van a utilizar se espera que treinta mil (30,000) de ellos sean aguas usadas. **Van a generar treinta mil (30,000) galones diarios en aguas usadas. Esas aguas usadas se van a manejar a través de pozos filtrantes que van a filtrar las aguas al terreno y de ahí se infiltra a subsuelo, al acuífero con el potencial obviamente de contaminarlo.** Transcripción de la Vista del 30 de noviembre de 2009, págs. 63-64. (Énfasis nuestro.)

Finalmente, el perito testificó también en torno al

impacto en las utilidades públicas; el aspecto de la servidumbre de paso de la carretera; los recursos arqueológicos existentes y los riesgos de escape de los monos.

De la transcripción de la vista evidenciaria surge claramente que los demandantes demostraron ser vecinos y colindantes que pudieran quedar afectados por el proyecto. Al así demostrarlo cumplieron con el requisito del Art. 28 el cual, como mencionamos, concede legitimación a vecinos y colindantes que pudieren verse afectados. En específico, el señor Brito Díaz testificó que vive desde hace trece (13) años en el barrio Pueblito del Carmen el cual es cercano al proyecto. Véase, Transcripción de la Vista del 9 de noviembre de 2009, pág. 63. De igual forma, el Sr. Ángel L. Sanabria Morales testificó ser legislador municipal[3] y residente del barrio Pueblito del Carmen. Véase, Transcripción de la Vista del 9 de noviembre de 2009, págs. 66-67.

Por su parte, el Sr. José Rodríguez Collazo testificó que es agricultor y es dueño de una finca de ciento treinta y nueve (139) cuerdas en el mencionado barrio Pueblito del Carmen en dónde vive hace quince (15) años. Véase, Transcripción de la Vista del 9 de noviembre de 2009, págs. 68-69. Fue estipulado que la mencionada finca es colindante al proyecto de Bioculture. Íd. págs. 73-75. El señor

---

[3]Habida cuenta de que el señor Sanabria Morales satisface los requisitos de ser vecino, huelga analizar su legitimación activa en su capacidad de legislador municipal.

Rodríguez Collazo, a preguntas de uno de los representantes legales de Bioculture, testificó acerca de cómo se ve afectado con el proyecto. Específicamente, expresó que desarrolló un proyecto de viviendas en la finca colindante a la de Bioculture. A ese proyecto que desarrolló le puso agua y luz. Además, construyó una carretera. Tenía tres (3) compradores. Pero cuando éstos escucharon del proyecto de los monos, se arrepintieron. Transcripción de la Vista del 9 de noviembre de 2009, págs. 99-100.

Así también, el señor Rodríguez Collazo testificó que tenía planes para continuar desarrollando el resto de su finca, mediante la construcción de una hacienda, pero que debido a la situación con Bioculture la ha detenido. Íd., pág. 100.

Otro testigo, el Sr. Enrique Cruz Mercado, testificó que ha sido residente del barrio Pueblito del Carmen por toda su vida, y que su residencia queda cerca al proyecto de Bioculture. Íd., pág. 108. De igual forma, la Sra. Lydia Luz Rivera Laporte expresó en la vista que es residente del barrio Pueblito del Carmen y que el proyecto estaba aproximadamente a nueve (9) minutos de su parcela. Véase, Transcripción de la Vista del 9 de noviembre de 2009, págs. 111-112. La Sra. Margarita Palou Morales también testificó ser residente de Pueblito del Carmen y que el proyecto estaba a una distancia de cinco (5) minutos de su residencia. Íd., págs. 113-114.

Como vemos, la prueba testifical de la vista evidenciaria logró establecer la posibilidad de que los vecinos y colindantes se vieran afectados. Reiteradamente hemos establecido que ante la ausencia de indicio alguno de que el Tribunal de Primera Instancia incurrió en *manifiesto error, prejuicio, parcialidad o pasión* al apreciar la evidencia desfilada, no intervendremos con la evaluación de la prueba realizada por el foro primario. <u>López Fantauzzi v. 100% Natural</u>, res. el 16 de marzo de 2011, 2011 T.S.P.R. 40; <u>Rivera Pérez v. Cruz Corchado</u>, 119 D.P.R. 8 (1987); <u>Rodríguez Cancel v. A.E.E.</u>, 116 D.P.R. 443 (1985).

La prueba presentada ante el Tribunal de Primera Instancia y que fue creída por el juzgador demostró que los vecinos cumplieron con los requisitos del Art. 28. Más importante aún, para fines del procedimiento especial del Art. 28 quedaron demostradas las violaciones a la reglamentación de planificación. Los terrenos en los que Bioculture pretende establecer su laboratorio industrial están clasificados como R-G, uno esencialmente agrícola. En consecuencia, los usos a ser permitidos en el distrito clasificado como R-G deben ser compatibles con los propósitos del mismo.

No nos encontramos ante un proyecto agrícola. La propia A.R.Pe. paralizó el 15 de mayo de 2009 el proyecto de Bioculture **"por entender que el proyecto conllevaría un laboratorio de investigación con primates**…". (Énfasis nuestro.) Véase, Informe Final de la Comisión de Recursos

Naturales y Ambientales del Senado de Puerto Rico sobre la R. del S. 513 de 10 de noviembre de 2009, 16ta. Asamblea Legislativa, 2da. Sesión Ordinaria, pág. 9. La solicitud de la propia Bioculture, ante el Departamento de Agricultura, confirma la incompatibilidad de su fin primario con los primates, al exponer que "… se dedicará a la crianza, reproducción y exportación de animales (*SPF Gynos*) **y a la realización de proyectos de investigación en el campo de la biomedicina**".

Ante semejante cuadro, el Tribunal de Primera Instancia resolvió conforme a derecho al conceder el remedio provisto por el Art. 28.

Mientras tanto, siguen pasando los meses y la Junta Revisora ha optado por no actuar a la ligera, emulando al Tribunal de Apelaciones. Es su decisión, y no nuestra función, intervenir en esta etapa en su raciocinio. Ahora bien, mientras la Junta Revisora emite su dictamen, es nuestro deber proteger el interés público y sostener el remedio temporero concedido por el foro primario y confirmado por el Tribunal de Apelaciones.

Las acciones de paralización y de fiscalización responsable de las propias agencias administrativas del Gobierno de Puerto Rico, me mueven a ser cauteloso a la hora de permitir la introducción de una colonia de miles de primates que podrían causar serios problemas a la agricultura, a la seguridad y a las propiedades, tal como ha surgido en el pasado en el litoral suroeste de Puerto

Rico. Es el propio Gobierno que ha paralizado inicialmente dicho proyecto.

A modo de ejemplo, el 28 de abril de 2009, el Departamento de Recursos Naturales y Ambientales presentó una solicitud de investigación de querella bajo el número de caso 09CQ4-00000-01016 ante A.R.Pe. por la construcción de estructuras para una alegada crianza de animales sin permiso. El 15 de mayo de 2009, la A.R.Pe inspeccionó la propiedad y encontró que el proyecto se encontraba en construcción. La agencia, responsablemente, lo paralizó. De igual forma, el 17 de julio de 2009, la Junta de Calidad Ambiental inspeccionó el área del proyecto y los días 29 y 30 de julio emitió dos Notificaciones por Violación a Bioculture, relacionadas con el Reglamento para el Control de los Desperdicios Fecales de Animales; el Reglamento de Manejo de Desperdicios Sólidos No Peligrosos y el Reglamento para el Control de la Inyección Subterránea. Véase, Informe Final de la Comisión de Recursos Naturales y Ambientales del Senado de Puerto Rico sobre la R. del S. 513, *supra*. Estos Reglamentos inciden en las preocupaciones de salud, ambiente y seguridad que precisamente trajeron a la atención del Tribunal de Primera Instancia los colindantes y vecinos recurridos.

Ante la seriedad del cuadro de deficiencias e incumplimientos de Bioculture, la meticulosidad, la prudencia y la protección del interés público por encima de un interés privado, constituyen un acierto y no un error.

En resumen, para fines de los requisitos del Art. 28, considero que actuó correctamente el Tribunal de Apelaciones al confirmar el dictamen del foro primario. No existen justificaciones de peso para conceder un auxilio de jurisdicción ni revocar la sentencia del Tribunal de Apelaciones. Las consideraciones económicas y privadas que plantea Bioculture no me motivan a revocar un remedio provisional que protege al interés público. En atención a lo antes intimado, estoy conforme con el curso tomado por los compañeros y compañeras de la mayoría de este Tribunal.

## III.

Por las razones anteriormente expuestas, es mi criterio que no procede expedir el auto de *certiorari* en los casos de epígrafe ni paralizar el efecto del interdicto especial emitido.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Roberto Brito Díaz; Ángel Luis Sanabria Morales; Keila Colón Rivera; José C. Rodríguez Collazo; José Enrique Cruz Mercado; Nydia Luz Rivera Laporte; Marianita Palau; Carla Capalli Rosa; Ángel Torres y People For The Ethical Treatment of Animals (PETA)<br><br>Recurridos<br><br>v.<br><br>Bioculture Puerto Rico, Inc.; Estado Libre Asociado de Puerto Rico; Administración de Reglamentos y Permisos (ARPE); Departamento de Justicia; Junta de Calidad Ambiental (JCA); Departamento de Recursos Naturales y Ambientales (DRNA); Departamento de Agricultura; Compañía de Fomento Industrial (PRIDCO); Municipio de Guayama; Ing. José Mateo Colón; e Ing. Germán Torres Berríos<br><br>Peticionarios | CC-2011-929<br>CC-2011-931 |

Voto particular disidente emitido por la Jueza Asociada señora PABÓN CHARNECO, al cual se une el Juez Asociado señor RIVERA GARCÍA y el Juez Asociado señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 9 de diciembre de 2011.

Difiero del proceder de una mayoría de miembros de este Tribunal que decide denegar las mociones en auxilio de jurisdicción y los recursos de *certiorari* presentados

en los casos de autos. Esta decisión tiene el efecto de mantener vigente un *injunction* **permanente** en contra de una parte involucrada en un pleito de alto interés público.

A su vez, hoy una mayoría del Tribunal permite que una parte que ostenta un permiso de construcción de las agencias pertinentes, **que no ha sido invalidado por el ente con jurisdicción exclusiva para ello**, quede impedida **permanentemente** de continuar construyendo unas instalaciones en las cuales se han invertido millones de dólares. En el camino, se trastoca la confianza en nuestras instituciones y en nuestro ordenamiento jurídico, el cual debe aspirar a garantizar un ambiente de uniformidad y consistencia en la aplicación del Derecho.

Lamentablemente, para llegar a esta conclusión, una mayoría del Tribunal trastoca nuestra normativa en cuanto a legitimación activa en procedimientos administrativos. Peor aún, en uno de los votos emitidos hoy se utilizan **factores exógenos al Derecho** y escenarios que no surgen de los autos - que envuelven simios fugitivos rondando por la Isla destruyendo cosechas agrícolas - para llegar a su conclusión. Por las razones que discuto a continuación, me veo en la obligación de disentir respetuosamente de la decisión que toma hoy el Tribunal.

I

El origen de los casos de autos se remonta al año 2006 cuando el Gobierno de Puerto Rico comenzó una campaña

para promocionar la Isla como un Centro de Desarrollo de la Economía del Conocimiento. En esencia, se diseñó un plan para incentivar la inversión en Puerto Rico de compañías especializadas en el campo de la biotecnología. Entre las entidades interesadas en invertir en Puerto Rico se encontraba la compañía Bioculture Mauritius Ltd. (en adelante B.M.). Esta entidad se dedica a la crianza de primates de la especie macaco cangrejero (*macaca fascicularis),* los cuales son utilizados por diversas empresas para estudios científicos. Atraída por la campaña del Gobierno de Puerto Rico, en febrero de 2008 B.M. organizó la corporación subsidiaria Bioculture Puerto Rico, Inc. (en adelante Bioculture) para dirigir y coordinar su inversión en la Isla.

Así las cosas, luego de gestiones por parte de Bioculture la entonces Administración de Reglamentos y Permisos (en adelante A.R.P.E.)[4] expidió en diciembre de 2008 un permiso de construcción para un centro de operaciones de primates en el Municipio de Guayama. Este centro comenzó a construirse en febrero de 2009.

Para esa misma fecha, un grupo de vecinos del Municipio de Guayama, dirigidos por Roberto Brito Díaz y varias organizaciones tales como *People for the Ethical Treatment of Animals* (en adelante P.E.T.A.), presentaron

---

[4] Esta agencia fue reemplazada por la Oficina de Gerencia y Permisos, a tenor con el esquema establecido por la Ley 161-2009, 23 L.P.R.A. sec. 9012(b).

una Querella ante A.R.P.E. en la cual cuestionaron el otorgamiento del permiso de construcción. A.R.P.E. ordenó la paralización del proyecto al identificar algunas deficiencias en el trámite de otorgación del permiso original. Luego de corregir las deficiencias y gestionar un nuevo permiso, A.R.P.E. otorgó el mismo en junio de 2009. Inconformes, el grupo de vecinos apeló la otorgación del permiso ante la entonces Junta de Apelaciones sobre Construcciones y Lotificaciones (J.A.C.L.). Esta apelación aún está pendiente ante la agencia.

Aún inconformes, y sin haber concluido los trámites administrativos a nivel apelativo, los vecinos (en adelante recurridos), presentaron una Demanda ante el Tribunal de Primera Instancia al amparo del Art. 28 de la Ley Núm. 76 de 24 de junio 1975, según enmendada, conocida como Ley Orgánica de la Administración de Reglamentos y Permisos, 23 L.P.R.A. sec 72. Luego de realizar vistas evidenciarias durante los meses de noviembre y diciembre de 2009 y concluir que los recurridos poseían legitimación activa para entablar el pleito, el foro de instancia ordenó la paralización permanente de la construcción de Bioculture. En síntesis, el Tribunal de Primera Instancia sostuvo que el uso que se le daría a las facilidades en construcción no era compatible con la clasificación de los terrenos del área, por lo cual procedía la paralización del proyecto.

Insatisfechos, en enero de 2010 Bioculture y el Gobierno de Puerto Rico recurrieron al Tribunal de Apelaciones. A solicitud de los peticionarios, el foro apelativo intermedio **dejó sin efectos la Orden de Paralización** dictada por el Tribunal de Primera Instancia mientras atendía la Apelación presentada. Luego de tener esta Apelación ante su consideración por casi **dos (2) años,** el Tribunal de Apelaciones emitió una Sentencia el 30 de septiembre de este año en la cual confirmó el dictamen del foro de instancia.[5] En síntesis, el foro apelativo intermedio concluyó que la evidencia presentada por los recurridos satisfizo el requisito de legitimación activa del Art. 28 de la Ley Núm. 76, *supra* y que la reglamentación aplicable no permitía la construcción de las facilidades de Bioculture para su uso propuesto.

*A posteriori*, el 17 de noviembre de 2011 Bioculture y el Gobierno de Puerto Rico recurrieron a este Foro mediante dos (2) recursos de *certiorari*. A la misma vez, presentaron dos (2) mociones en auxilio de jurisdicción en las cuales solicitaron que dejáramos sin efecto la Orden

---

[5] El trámite procesal ante el Tribunal de Apelaciones fue un tanto anómalo. De los autos surge que se presentaron Recursos de Apelación ante el Tribunal de Apelaciones los días 27 y 29 de enero de 2010. *A posteriori*, dicho Foro emitió una Resolución el 29 de enero de 2010 en la cual declaró Ha Lugar dos mociones en auxilio de jurisdicción presentadas por Bioculture y el Gobierno de Puerto Rico. Los días 16 y 25 de febrero de 2010 se presentaron los Alegatos en Oposición a los Recursos de Apelación, por lo cual el foro apelativo intermedio estaba en posición de resolver los recursos desde esa fecha. Sin embargo, los recurridos de epígrafe presentaron diversas Mociones para Suplementar las Oposiciones al Recurso de Apelación, que incluían documentos y demás evidencia que no formó parte del trámite del caso ante el Tribunal de Primera Instancia. La presentación de estas Mociones Suplementarias se extendió hasta diciembre de 2010.

de Paralización Permanente emitida por el Tribunal de Primera Instancia.

II

Los peticionarios sostienen que los recurridos del caso de autos carecen de legitimación activa para entablar el pleito. Como sabemos, los tribunales en Puerto Rico solo pueden ejercer su función judicial ante casos y controversias. *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958). Uno de los requisitos para que exista un caso justiciable es que las partes que solicitan acceso al foro judicial, **ya sea en casos civiles o en procedimientos administrativos**, ostenten legitimación activa. *Fund. Surfrider y otros v. A.R.Pe.*, 178 D.P.R. 563 (2010), *Crespo v. Cintrón*, 159 D.P.R. 290 (2003), *Col. Peritos Elec. v. A.E.E.*, 150 D.P.R. 327 (2000), *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974). Este requisito asegura a los tribunales que los promoventes de un pleito en particular tienen un genuino interés en la resolución de la controversia, por lo cual defenderán sus posturas vigorosamente y traerán a la consideración de los tribunales todos los asuntos pertinentes. *Crespo v. Cintrón*, *supra*, pág. 299.

Como norma general, una parte ostenta legitimación activa si cumple cuatro requisitos, a saber que: "(1) ha sufrido un daño claro y palpable; (2) el referido daño es real, inmediato y preciso, y no abstracto e hipotético;

(3) **existe conexión entre el daño sufrido y la causa de acción ejercitada,** y (4) la causa de acción surge bajo el palio de la Constitución o de una ley". *Col. Peritos Elec. v. A.E.E., supra,* pág. 331. (Énfasis suplido).

Recientemente nos expresamos en cuanto al significado del requisito de legitimación activa en procedimientos administrativos. En *Fund. Surfrider y otros v. A.R.Pe., supra,* establecimos que una parte posee legitimación activa para presentar un recurso de revisión judicial al amparo de la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2101 *et seq.,* si (1) es parte del proceso y (2) fue **adversamente afectada** por la decisión de una agencia administrativa. *Íd.* págs. 575-576. A su vez, concluimos que una parte adversamente afectada es aquella que "tiene un interés sustancial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administrativa que se impugna mediante el recurso de revisión judicial. **El daño tiene que ser claro, específico y no puede ser abstracto, hipotético o especulativo**". *Íd.* pág. 579. (Énfasis suplido).

A pesar de que en *Fund. Surfrider y otros v. A.R.Pe., supra,* analizamos el requisito de legitimación activa en procedimientos administrativos, los fundamentos que allí discutimos son de igual aplicación a casos civiles

ordinarios. A su vez, y a diferencia de lo que concluye el Juez Asociado señor Estrella Martínez en su voto de conformidad, la normativa de *Fund. Surfrider y otros v. A.R.Pe., supra,* es de aplicación al derogado Art. 28 de la Ley Núm. 76, *supra*. El texto del artículo establecía que tendrían derecho a solicitar la acción estatuida "los colindantes y vecinos que **pudieren ser afectados**" por la alegada violación a los reglamentos de A.R.P.E. 23 L.P.R.A. sec. 72(c). Al utilizar ese lenguaje, el propio texto del derogado artículo establecía que los colindantes y vecinos tendrían que demostrar que, de alguna forma, habían sido o podían ser **afectados** por la construcción que impugnan.

El lenguaje del Art. 28 es similar al de la Sección 4.2 de la Ley Núm. 170, *supra*, que fue objeto de interpretación en *Fund. Surfrider y otros v. A.R.Pe., supra*. Esa sección establece que solo podrá solicitar revisión de una orden o resolución final de una agencia aquella parte que sea **adversamente** afectada por esta. Véase 3 L.P.R.A. sec. 2172. Ciertamente, no se requiere que **los vecinos o colindantes** que comparecen al tribunal al amparo del Art. 28 demuestren un daño de naturaleza irreparable. Sin embargo, están obligados a demostrar que fueron o serán afectados por la construcción que impugnan. *A.R.Pe. v. Rivera*, 159 D.P.R. 429, 443 (2003), *A.R.Pe. v. Rodríguez*, 127 D.P.R. 793, 808 (1991). Por ende, los

vecinos y colindantes deben cumplir con los requisitos de legitimación activa esbozados en nuestra jurisprudencia, inclusive lo decidido en *Fund. Surfrider y otros v. A.R.Pe., supra*. Como muy bien señala el compañero Juez Asociado señor Martínez Torres en su voto de conformidad, resolver lo contrario convertiría al Art. 28 en un amuleto mágico que permitiría a una sola persona obviar los requisitos de legitimación activa y paralizar permanentemente la construcción de proyectos.

En el caso de autos, existe un serio cuestionamiento en cuanto a si los vecinos-recurridos poseen legitimación activa para sostener un pleito al amparo del Art. 28 de la Ley 76, *supra*. Surge de los recursos que varios de los recurridos alegaron ser "vecinos" del área de Guayama, pero no se establece si sufrieron daños concretos debido a la **construcción** de las facilidades de Bioculture. *A contrario sensu*, las alegaciones de la Demanda presentan daños generalizados o especulativos, como por ejemplo, "la ansiedad, la angustia, que provoca el conocer que estos animales al arrebatarlos de su ambiente y al mantenerlos en cautiverio estarán sufriendo daños emocionales severos". Ap. *Certiorari* CC-2011-931, págs. 126-127.

Por otra parte, surge de los autos que durante las vistas evidenciarias de noviembre y diciembre de 2009 ante el Tribunal de Primera Instancia, los recurridos se limitaron a testificar su nombre y dirección, **sin detallar**

**cuáles daños sufrirían a causa de la construcción de Bioculture**. A la organización P.E.T.A., por su parte, se le reconoció legitimación activa porque uno de los recurridos alegó, sin más, ser miembro de esta. Ello es contrario a nuestra normativa en la cual hemos establecido que una organización puede demandar a nombre de sus miembros, pero que "tienen la obligación de alegar que los daños sufridos por uno o más de los socios dan lugar a una causa de acción justiciable **que cualquiera de ellos podría incoar en los tribunales**". *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 565 (1989) (Énfasis suplido).

A pesar de estos cuestionamientos, algunos miembros de este Tribunal quedan convencidos que por lo menos **uno** de los recurridos del caso de autos ostenta legitimación activa para llevar el pleito. Se trata de un colindante, quien alegó en la vista evidenciaria del 9 de noviembre de 2009 que había sufrido daños económicos a causa de la construcción de Bioculture y que sufrirá otros tipos de daños una vez la compañía comience sus operaciones. En específico, se desprende de la transcripción de la vista que el colindante testificó lo siguiente:

> P . . .¿Por qué más usted demandó? Concretamente
> que [sic] daño le causó a usted la construcción
> que lleva a cabo. . .
> R  Me causa el daño, que cuando usted me dijo
> primero, yo desarrollé un proyecto allí. . .

P   Ajá.

R   A la cual ya le pus[e] agua. . .

P   Unjú.

R   **Luz, carretera, y tenía tres comprador[es] de par de esos solares y cuando escucharon de la cosa esta de los monos, después se me arrepintieron. Y los tengo allí, mire muertos de la risa.**

. . .

P Okey. O sea, la razón por cual usted radicó este pleito es porque según usted, usted no pudo vender un desarrollo de vivienda urbano, [¿]esa es su razón[?].

R Si y por la agricultura que yo tenía **unos planes** ahora para continuar con el resto de la finca con una hacienda que quería hacer y eso pues me ha aguantado, licenciado.

P   No, pero explíqueme entonces como [sic] el proyecto de Bioculture concretamente afecta su actividad agrícola.

R   Entiendo por esos [sic] de los animales, de los monos de esos, como quiera **yo he oído tantos rumores de lo que está ocurriendo por allá en Lajas** y esos sitios pues, entiendo que eso me va a afectar a mis siembras también.

P   Escúcheme la pregunta, ¿verdad que allí no hay monos al día de hoy?

R   No.

P   Allí se construye[n] unos edificios.

R   Exacto.

P ¿La construcción de esos edificios, de qué manera le afecta a usted en su desarrollo urbano o actividad agrícola?

LCDO. MELENDEZ ZAYAS: Preguntada contestada.

HONORABLE JUEZ: No, conteste. No lugar a la objeción. Conteste.

TESTIGO: Bueno, el edificio como tal no me molestarían [sic] en nada.

POR EL LCDO. MARTINEZ LUCIANO:

P    Eso es lo que. . . los edificios como tal, no le molestan en nada.

R   Como tal.

P   ¿Y está conciente [sic] que lo que usted está impugnando en este caso es ese permiso de construcción y esos edificios? ¿Correcto?

R   Unjú.

P   No le afectan en nada.

R   **Los edificios no me molestan.**

P   No tengo más preguntas.

Transcripción Vista Evidenciaria 9 de noviembre de 2009, págs. 98-101.

Es en este testimonio que algunos miembros del Tribunal quedan convencidos que el colindante-recurrido del caso de autos cumple con los requisitos de legitimación activa esbozados en nuestra jurisprudencia para conceder un *injunction* **permanente**. Respetuosamente, no comparto esa conclusión. *Prima impressionis*, este testimonio levanta diversas interrogantes y dudas sobre la naturaleza del daño alegadamente sufrido por el colindante que me impiden identificar un daño claro y palpable.

Ello es así porque a la luz de este testimonio quedan sin respuestas preguntas tales como: ¿Quiénes eran los alegados compradores de los terrenos desarrollados? ¿Qué evidencia, más allá de sus alegaciones[6], tiene el colindante sobre la razón de los alegados compradores para desistir de la venta? ¿Cuán serias fueron las ofertas de compra? ¿En qué etapa se encontraban las alegadas negociaciones cuando los alegados compradores se enteran sobre "la cosa esa de los monos"? ¿Las alegadas ofertas fueron retiradas a causa de la construcción de los edificios de Bioculture o debido al futuro **uso** de estos? ¿Ha tenido otras ofertas desde que comenzó la construcción de Bioculture? Todas estas interrogantes me hacen

---

[6] Sabido es que las alegaciones hay que sustentarlas con prueba adecuada. Meras alegaciones no son suficientes así como tampoco las conjeturas. *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 D.P.R. 750 (1999); *Pueblo v. López Guzmán*, 131 D.P.R. 867 (1992); *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194, 210 (1987).

imposible llegar a la conclusión que el alegado daño sufrido por el colindante es claro y específico: faltan eslabones en la cadena para demostrar que el daño es lo suficientemente rastreable a la construcción que lleva a cabo Bioculture en Guayama.

Peor aún, los posibles daños agrícolas que alega el colindante son la encarnación de la especulación. Es impresionante que ante estas dos (2) alegaciones, una especulativa y una que levanta más interrogantes que certezas, algunos miembros de este Tribunal concluyan que el colindante demostró sufrir un **daño claro, específico y que no resulte abstracto, hipotético o especulativo. Meras opiniones y conclusiones no pueden mágicamente conferir legitimación activa.** No podemos permitir que las cuestiones de legitimación activa se conviertan en un "ingenioso ejercicio académico de lo concebible". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992), citando a *United States v. Students Challenging Regulatory Agencies Procedures (SCRAP)*, 412 U.S. 669, 688 (1973).

Más preocupante resulta que algunos miembros del Tribunal le reconozcan legitimación activa a este recurrido cuando la tinta de un precedente tan reciente como *Fund. Surfrider y otros v. A.R.Pe.*, *supra,* todavía está fresca. En ese caso sostuvimos que un demandante que alegó que una construcción en Rincón tendría el efecto de "rompe[r] la armonía y altera[r] las características de su

vecindario" *Íd.* pág. 588, y que **entendía** que agravaría un problema de distribución de agua en la comunidad, no cumplía con los requisitos de legitimación activa. Sustentamos ese proceder en que era insostenible reconocerle legitimación activa a una persona que presenta tales alegaciones tan **imprecisas** y **generales**.

**La norma de *Fund. Surfrider y otros v. A.R.Pe.*, *supra,* tiene que significar algo.** No puede sostenerse que palabras tan contundentes como "claro", "específico" y daños "no hipotéticos, abstractos o especulativos" sean sellos cuyo significado está sujeto a lo que en determinado día entienda una Mayoría de los miembros de este Foro. "Este Tribunal debe ser puntillosamente consecuente con su propia doctrina. No puede, como una Penélope jurídica, destejer en la oscuridad de la noche lo que tejió por el día". *López y otros v. Porrata y otros*, 156 D.P.R. 503, 529 (2002). (Opinión disidente del Juez Asociado Fuster Berlingeri).

Nuestros precedentes no solo se mantienen vigentes mientras no sean revocados, sino mientras exista la confianza de que estos serán aplicados consistentemente por los tribunales, particularmente **este** Tribunal. Me sostengo en que la alegación del colindante no cumple con el requisito de demostrar un daño claro, específico, palpable y no especulativo. *A contrario sensu*, especulativa es la conclusión de que con treinta y cuatro

(34) palabras en una transcripción de una vista evidenciaria, sin más, se le reconozca legitimación activa a una sola persona, lo cual tiene el efecto de paralizar **permanentemente** una inversión de millones de dólares. No puedo validar con mi voto ese proceder.

III

Por otra parte, me veo en la obligación de expresarme en cuanto a la metodología de adjudicación utilizada por el Juez Asociado señor Estrella Martínez en su voto de conformidad.

Los jueces debemos ser conscientes de la metodología que utilizamos para cumplir con la facultad que nos ha sido delegada por la Constitución y las Leyes. Obviamente, no existe un modelo de metodología adjudicativa perfecto e incuestionable. Después de todo, debemos recordar que la vida de la Ley no ha sido dictada por la lógica, sino por la experiencia humana.[7] Por ende, es de vital importancia que los juristas tengamos como base algún modelo de metodología de adjudicación.

Mi metodología adjudicativa me obliga a resolver las controversias que se presentan ante este Tribunal utilizando el Derecho **como única fuente**. En el esquema constitucional en el que vivimos, la Rama Judicial debe velar por guardar celosamente su rol de resolver casos

---

[7] Parafraseando el famoso pasaje del jurista Oliver Wendell Holmes: "the life of the law has not been logic; it has been experience." O. Wendell Holmes, *The Common Law*, 1881 (dominio público).

**conforme a Derecho**. Y lo que **es** el Derecho no se encuentra en ponencias que una Agencia presentó ante la Rama Legislativa. Mucho menos son fuente de Derecho las decisiones de política pública que toma la Rama Ejecutiva. Todos estos son factores exógenos a las herramientas que contamos para resolver casos: la Ley escrita y nuestros precedentes.

**La toga que ostentamos nos impide convertirnos en entes formuladores de política pública.** En nuestro esquema constitucional, ese rol se le ha reservado a otras ramas del gobierno. Así, cuando ante este foro comparece una parte, y argumenta que en Derecho procede que se falle a favor suyo, no podemos utilizar fuentes que van más allá del Derecho para resolverle en contra. Estas fuentes contaminan la sagrada labor constitucional de este Tribunal.

Toda vez que conozco mi metodología adjudicativa y mi rol como jueza, no puedo tomar una decisión amparándome en informes presentados ante la Cámara de Representantes, ni **especular** en cuanto a simios ruidosos o fugitivos que devastan el panorama de la Isla, ni "adoptar" en el vacío las posiciones de agencias de la Rama Ejecutiva. No nos incumbe a nosotros como juristas "ser cauteloso[s] a la hora de permitir la introducción de una colonia de miles de primates que podrían causar serios problemas a la agricultura, a la seguridad y a las propiedades" de

personas. Opinión de Conformidad el Juez Asociado Estrella Martínez, pág. 17. **Ese juicio de política pública está exclusivamente encomendado a otras ramas del gobierno.** Nuestro rol es determinar si las actuaciones de estas Ramas han sido conforme al Derecho vigente. Respetuosamente, este augusto Tribunal no puede convertirse en una segunda Asamblea Legislativa. Tampoco debe regresar a un pasado en el cual se sustituía el juicio de política pública de otras ramas por el de una mayoría de miembros de este Foro. Véase *Misión Ind. P.R. v. J.P. y A.A.A.*, 142 D.P.R. 656, 689 (1997) y *Colón Cortés v. Pesquera*, 150 D.P.R. 724, 789 (2000).

IV

En fin, la conclusión a la que llega el Tribunal hoy es altamente preocupante. Demuestra una falta de consistencia en la aplicación de nuestros precedentes recientes y, peor aún, fomenta un panorama de incertidumbre en cuanto a la rectitud de las decisiones de nuestras instituciones gubernamentales. Al igual que en otras ocasiones "[e]sta controversia está matizada por un alto interés público y requiere de este Tribunal el más ponderado y sereno análisis jurídico, a fin de garantizar la seguridad jurídica y la estabilidad de nuestro ordenamiento legal, así como la confianza en nuestras instituciones gubernamentales, administrativas y

judiciales". *San Gerónimo Caribe Project v. A.R.Pe.*, 174 D.P.R. 640, 644-645 (2008).

A su vez, debemos recordar que aunque el Art. 28 de la Ley Núm. 76, *supra*, ha sido derogado, cabe la posibilidad de que existan cientos de proyectos que estén siendo cuestionados bajo las disposiciones de este. Con la conclusión a la que llega el Tribunal hoy, se permite que un solo colindante, sin ostentar legitimación activa, logre paralizar permanente un proyecto de construcción en el cual se han invertido millones de dólares.

A la luz de esta decisión, Bioculture queda **permanentemente** impedida de continuar construyendo su proyecto en Guayama. Ello a pesar de la expectativa que nuestro ordenamiento le ha creado sobre la corrección de los permisos de construcción que ostenta. Debemos recordar que en enero de 2010 el Tribunal de Apelaciones dejó sin efectos el *injunction* permanente en el caso de autos y por dos (2) años permitió que Bioculture continuara su construcción.[8]

---

[8] En aquellas circunstancias en que se solicite la paralización de los efectos de un *injunction*, hemos establecido que la solicitud debe cumplir los siguientes requisitos: (a) **que la parte peticionaria presente un caso fuerte con probabilidades de prevalecer en los méritos;** (b) que sufrirá un daño irreparable si no se detiene la ejecución de la sentencia; (c) que la paralización no causará daño sustancial a las demás partes; y (d) que no se verá perjudicado el interés público. Véase *Pantoja Oquendo v. Mun. de San Juan*, 2011 T.S.P.R. 82, 2011 J.T.S. 87, 182 D.P.R. ___ (2011), res. el 9 de junio de 2011; *Plaza Las Américas , Inc. v. N & H*, 166 D.P.R. 631, 642-643 (2005); *Peña v. Federación de Esgrima de P.R.*, 108 D.P.R. 147, 154 (1978).

Hoy el Tribunal valida un escenario shakespeariano en el cual una parte que ostenta permisos de construcción es llevada a los tribunales por demandantes sin legitimación activa, a la cual un tribunal apelativo le reconoce altas probabilidades de prevalecer y, *a posteriori*, dos (2) años después le anuncia que su proyecto de construcción es ilegal y le prohíbe **permanentemente** continuar con este. Respetuosamente, la "Comedia de los Errores" no debería ser avalada por este Tribunal.

Aun cuando las revisiones de sentencias "se dan contra la decisión y no contra los fundamentos" (Voto de Conformidad del Juez Asociado señor Martínez Torres, pág. 15), hacemos un pobre servicio al ordenamiento si nuestros propios fundamentos son cuestionables y carentes de consistencia. No puedo avalar con mi voto este proceder.

Consecuentemente, declararía Ha Lugar tanto las mociones en auxilio de jurisdicción como los recursos de *certiorari* presentados.


Mildred G. Pabón Charneco
Jueza Asociada